UNITED STATES of America

v.

Charles F. CULVER, A. Gordon Boone,
D. Spencer Grow, C. Oran Mensik
and Henry McGurren.

Cr. No. 26195.

United States District Court
D. Maryland.

Oct. 3, 1963.

Joseph D. Tydings, U. S. Atty., Stephen H. Sachs and Benjamin R. Civiletti, Asst. U. S. Attys., Baltimore, Md., and Thomas P. Curran, Attorney, Department of Justice, Washington, D. C., for United States.

Alan H. Murrell, Baltimore, Md., for defendant Culver.

G. C. A. Anderson and John F. King, Baltimore, Md., for defendant Boone.

Edward P. Morgan, E. Tillman Stirling and Welch, Mott & Morgan, Washington, D. C., for defendant Grow.

Edward J. Calihan, Jr., Chicago, Ill., for defendant Mensik.

Maurice J. Walsh, Chicago, Ill., for defendant McGurren.

THOMSEN, Chief Judge.

This nine-count indictment for mail fraud, 18 U.S.C. § 1341, is based upon alleged false representations and concealments with respect to the insurance protection afforded depositors in certain savings and loan associations[1] under policies issued by Security Financial Insurance Corporation (SFIC). Judge Watkins granted a severance with respect to J. Thomas Ellicott, one of the original defendants. The defendant Culver has pleaded nolo contendere. The other defendants have filed a great many motions and have adopted each others' motions, upon all of which this Court has ruled. The only motions calling for discussion are:

I. The motions to dismiss the indictment on a number of overlapping grounds, including (A) vagueness, uncertainty and failure to state an offense, (B) duplicity, (C) insufficient allegations as to the mailings, and (D) failure to allege that certain acts were done knowingly or wilfully;

II. The motions to suppress the corporate papers and records of SFIC and of several associations, obtained in various ways discussed below, or produced in response to grand jury subpoenas or trial subpoenas addressed to the corporations or to persons other than defendants.

THE INDICTMENT

The first count charges:

Paragraph 1—(a) SFIC was incorporated in Maryland in July 1959,[2] licensed in September 1959, and from that time until July 1962 issued policies of insurance on savings accounts in savings and loan associations.

(b) Defendant Culver was an incorporator of SFIC, president from July 1959 to July 1961, and a director from December 1959 to July 1961.

(c) Defendant Boone was an incorporator of SFIC, and was a director and its attorney from July 1959 to July 1961.

(d) Defendant Ellicott was an incorporator of SFIC, was a director from July 1959 to July 1961 and acted as its attorney from July 1959 to January 1962. He also dominated and controlled the business and affairs of two Maryland savings and loan associations from specified dates in 1960 until July 1962.

(e) Defendant Mensik dominated and controlled the business and affairs of six Maryland associations, including Commercial, Maryland Thrift and Maryland District from specified dates in 1957 until May 1962, July 1962 or later.

(f) Defendant Grow dominated and controlled the business and affairs of one Idaho and two Utah associations from June 1959 until after July 1962, and of two Maryland associations, namely, First Fidelity, from before June 1959 to April 1961, and First Guarantee, from June 1960 to September 1961.

(g) Defendant McGurren was an attorney at law licensed to practice in Illinois.

Paragraph 2. From about June 1959 until about July 1962, the six defendants devised a scheme and artifice to defraud any and all persons who were investors in, or could be induced to become investors in, savings accounts of certain associations, to wit, those associations which would and did represent to such investors and potential investors that savings accounts were insured by SFIC, and to obtain money and property by means of false and fraudulent pretenses, representations and promises; and it was as a part of said scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, and in furtherance thereof that:

---

1. The word "association" in this opinion will mean a "savings and loan association".

2. The days of the month specified in the indictment and the full name and state of incorporation of the several associations referred to therein have been omitted for the sake of brevity.

(a–b) In July 1959 the six defendants would and did organize and incorporate SFIC in Maryland, and in September 1959 would and did obtain a license authorizing it to do business as an insurance company in Maryland.

(c–j), (m–q) On various dates from September 1959 to January 1961, the six defendants would and did issue and cause to be issued on behalf of SFIC binders of insurance to each of the fourteen associations named in Paragraph 1(d)–(f) of the indictment, purporting to insure against loss the savings accounts in the respective associations.

Subparagraphs (k) and (l) contain similar allegations with respect to policies issued to two associations known respectively as Military Service and Phoenix; the persons controlling these two associations were not specified.

(r) From time to time during the period of the scheme the six defendants would and did issue and cause to be issued similar policies with respect to accounts in other associations organized or caused to be organized by defendants Grow and Mensik.

(s) The six defendants would and did prepare and distribute, cause to be prepared and distributed, and approve the preparation and distribution, by mail and otherwise, of brochures, specimen insurance policies, advertising leaflets, financial statements, newspaper advertisements and correspondence designed and intended by the defendants to lead the investing public to believe that savings accounts in associations insured by SFIC were desirable and secure investments because said associations were financially sound and strictly supervised by SFIC.

(t) The six defendants would and did organize SFIC or cause it to be organized, and would and did exercise and cause to be exercised, the corporate power and authority of SFIC in order to attract the investment of funds by the investing public to associations organized, dominated and controlled by the defendants Ellicott, Grow and Mensik, to the personal gain and benefit of the defendants Ellicott, Grow and Mensik.

Paragraph 3. It was a part of said scheme and in furtherance thereof that the six defendants through the preparation and distribution or brochures and other items referred to in Paragraph 2(s) would and did make and cause and approve the making of the following false and fraudulent pretenses, representations and promises, well knowing at the time that said pretenses, representations and promises would be false and fraudulent when made:

(a) That SFIC was dedicated to guarantee the safety of savings in the institutions that it insured.

(b) That associations insured by SFIC earned the right to acquire insurance from SFIC by meeting high standards of financial responsibility required and enforced by SFIC.

(c) That associations insured by SFIC were required by SFIC to maintain high standards of financial responsibility and were therefore financially sound.

(d) That SFIC, by requiring insured associations to submit to it monthly reports and by periodic examinations and audits conducted on behalf of SFIC, exercised strict supervision over the financial practices and operating procedures of associations insured by SFIC.

Paragraph 4. It was a part of said scheme and in furtherance thereof that while making the false and fraudulent pretenses, representations and promises referred to in Paragraph 3, the six defendants would and did wilfully conceal:

(a) That SFIC was organized and operated by the six defendants for the primary purpose of enabling associations controlled and dominated by defendants Mensik, Grow and Ellicott to advertise that savings accounts in said associations were "insured".

(b) That SFIC and its officers and directors were continually informed that associations insured by SFIC, including those associations dominated and controlled by the defendants Ellicott, Grow

and Mensik, were being operated in a manner inconsistent with sound financial practices and in a manner which jeopardized the safety and security of the funds invested by investors in savings accounts in those associations.

Paragraph 5. That on or about October 28, 1959, the six defendants did, for the purpose of executing the aforesaid scheme and artifice and attempting to do so, place and cause to be placed in an authorized depository for mail matter in the State and District of Maryland to be delivered by the United States Post Office Department a letter addressed to Mr. C. K. Raynor, 13 Lilly Street, Newburgh, New York, containing a balance sheet of SFIC.

The other eight counts are the same as the first count, except for the dates of the mailings (from November 27, 1959 to July 11, 1961), the names of the addressees, and the material enclosed (e. g. specimen policies of SFIC, brochures and other advertising material dealing with SFIC).

## I. MOTIONS TO DISMISS

### A. *Vagueness, Uncertainty and Failure to State an Offense*

 The indictment is not vague and uncertain. It follows "Form 3, Indictment for Mail Fraud", in the Appendix of Forms attached to the Federal Rules of Criminal Procedure. United States v. Bagdasian, 4 Cir., 291 F.2d 163, 164, 165 (1961), cert. den. 368 U.S. 834, 82 S.Ct. 60, 7 L.Ed.2d 36 (1961); United States v. Suchman, D.Md., 206 F.Supp. 688, 689, 690 (1962). It meets the tests set out in Russell v. United States, 369 U.S. 749, 769, 771, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962). See also Martin v. United States, 10 Cir., 285 F.2d 150, 151 (1960), cert. den. 365 U.S. 853, 81 S.Ct. 818, 5 L.Ed.2d 816; United States v. Hoffa, S.D.Fla., 205 F.Supp. 710, 716, 717 (1962).

Defendants argue that the alleged misrepresentations (see (3) (a), (b), (c) and (d), above) are vague. But they are the representations which the defendants themselves are alleged to have made or

caused to be made; they are not standards selected by the grand jury. Whether or not misrepresentation (a), standing alone, might be considered too vague to be the basis of a criminal charge, coupled with the other alleged misrepresentations and concealments, its point is more definite. At the conclusion of the government's case the Court will consider whether the evidence gives sufficient sharpness to misrepresentation (a) to permit its submission to the jury. The government will, of course, be required to prove that the representations were made with the alleged deceptive intent, that they were untrue, and that defendants knew them to be untrue when made. The language of the representations is not too vague to be the basis for a criminal charge. See United States v. Ragen, 314 U.S. 513, 523, 62 S.Ct. 374, 86 L.Ed. 383 (1942); Lonergan v. United States, 9 Cir., 88 F.2d 591, 594 (1937), reversed on other grounds, 303 U.S. 33, 58 S.Ct. 430, 82 L.Ed. 630; Linden v. United States, 4 Cir., 254 F.2d 560 (1958); United States v. Suchman, D.Md., 206 F.Supp. 688, 689, 690 (1962).

Each count alleges an offense under the mail fraud statute, 18 U.S.C. § 1341.

### B. *Duplicity*

 Defendants' claim of duplicity is based on their contention that the indictment charges both a scheme to defraud and a scheme to obtain money by false pretenses, and that the two are not necessarily the same. They admit that a scheme to defraud may include the obtaining of money by misrepresentations or false pretenses incident thereto, and that a mail fraud indictment may allege a scheme to defraud and to obtain money, conjunctively, in a single count, where the defendants are legally capable under the averments of the indictment of having committed both of what otherwise may be two separate offenses. Taking certain portions of the indictment out of context, defendants argue that those allegations would permit the government to offer evidence tending to prove that investors were defrauded by the misuse

of their money after it was deposited in savings accounts in the several associations.

However, when those sentences are read in context, and the indictment is considered as a whole, it is clear that the only scheme to defraud charged in the indictment is a scheme to obtain deposits from prospective investors by the false pretenses, representations and concealments set out in the indictment, and to persuade existing investors by the same false pretenses, representations and concealments to maintain and increase their deposits. The indictment does not charge a scheme to defraud existing depositors by misappropriation, embezzlement or other activity of a criminal nature affecting funds already in the association. So construed,[3] the indictment charges a single scheme which may properly be described both as a scheme to defraud and a scheme to obtain money by false pretenses and representations, since the alleged purpose of the scheme was to obtain and maintain deposits in savings accounts in certain associations by means of the false pretenses and representations and the concealments specified in the indictment. The indictment is not duplicitous. Livezey v. United States, 5 Cir., 279 F. 496, 498–499 (1922), cert. den. 260 U.S. 721, 43 S.Ct. 12, 67 L.Ed. 481; Hass v. United States, 8 Cir., 93 F.2d 427, 432 (1937); Morris v. United States, 5 Cir., 112 F.2d 522, 526 (1940). See also United States v. Stever, 222 U.S. 167, 173, 32 S.Ct. 51, 56 L.Ed. 145 (1911); Linden v. United States, 4 Cir., 254 F.2d 560 (1958).

█ Defendants' argument that some of the alleged acts could not reasonably be considered to have been done in furtherance of the scheme is without merit. United States v. Sampson, 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962). Also without merit is their argument, based on such cases as Ingram v. United States, 4 Cir., 272 F.2d 567 (1959), that multiple defendants have been charged with offenses that are in no way connected. The indictment in this case charges a single scheme, and charges that all six defendants participated in it. It is not necessary to allege that all six defendants benefited in the same way, or at all. United States v. Painter, 4 Cir., 314 F.2d 939, 942 (1963); United States v. Bagdasian, 4 Cir., 291 F.2d 163, 164 (1961).

### C. The Mailings

█ Defendants object because copies of the mailings have not been attached to the indictment and contend that the mailings are not set out in substance therein.

The paragraphs alleging the mailings in the present indictment give the date of the offense, the name and address of the addressee and information with respect to the relevant enclosures, if any, contained in the mailings. Neither Form 3, Appendix of Forms, F.R.Crim.P., nor the decided cases indicates that anything further is required. Durland v. United States, 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709 (1896). See also Moffitt v. United States, 10 Cir., 154 F.2d 402, 405 (1946), cert. den. 328 U.S. 853, 66 S.Ct. 1343, 90 L.Ed. 1625; Scheib v. United States, 7 Cir., 14 F.2d 75, 77 (1926), cert. den. 273 U.S. 701, 47 S.Ct. 95, 71 L.Ed. 848; United States v. Herzig, S.D.N.Y., 26 F.2d 487 (1928). Reproduction of available documentary evidence in support of the mailings has been furnished as part of the bills of particulars filed by the government.

Defendants further complain because no sufficient factual basis is stated for the allegations that the mailings were in furtherance of the alleged scheme to defraud. The relevant paragraph in each count, however, alleges that the specified mailing was "for the purpose of executing the aforesaid scheme and artifice and attempting to do so". Nothing further is required. Form 3, Appendix of Forms, F.R.Crim.P.; United States v. Hoffa, S.D.Fla., 205 F.Supp. 710, 716–717.

3. The particulars furnished by the government support its position that the indictment was so limited.

*D. Knowingly and Wilfully*

■ Defendants argue that the mailings and some of the other acts charged in the indictment are not alleged to have been done "knowingly" or "wilfully". All of the acts, however, are alleged to have been done or caused to be done by the six defendants as part of or in furtherance of or for the purpose of executing the alleged scheme to defraud. Such an allegation satisfies the requirements both of sec. 1341 and sec. 2. Glenn v. United States, 5 Cir., 303 F.2d 536, 538–539 (1962); United States v. Suchman, D.Md., 206 F.Supp. 688, 690 (1962). See also Form 3, Appendix of Forms, F.R.Crim.P.

## II. MOTIONS TO SUPPRESS

Each of the remaining defendants— Boone, Grow, Mensik and McGurren—has filed or adopted a series of motions to suppress the corporate papers and records of SFIC and of several associations, or copies of such papers and records,

(a) obtained from the respective corporations or their officers, conservators or receivers, by postal inspectors with the consent of such officers, conservators or receivers, or

(b) produced in response to grand jury subpoenas or trial subpoenas addressed to the corporations or to persons other than defendants.

The motions contend that the several subpoenas were too broad, and that the persons who responded to the subpoenas or consented to the examination of the records had no authority to do so, or did so under duress, in each case amounting to an unreasonable search and seizure prohibited by the Fourth Amendment. During the hearings on the motions defendants also argued that there had been an abuse of the grand jury process.

No defendant took the stand, but two postal inspectors and former Assistant United States Attorney Weiner testified, statements of Assistant United States Attorney Sachs were accepted by agreement in lieu of testimony, many exhibits were filed, and the points have been fully briefed and argued.

The Court has made and filed findings of fact with respect to all points raised. In this opinion the material facts with respect to each point will be summarized, and inferences will be drawn from the historical facts.

*A. Generally*

The following statements apply to all the motions to suppress.

No defendant contends that any personal paper of his was taken or examined in any incident of which he complains.

No defendant has been required to testify or to produce any papers. No such Fifth Amendment right is involved.

■ There is no Fifth Amendment privilege with respect to the production of the records of a corporation, even when they are in the custody or possession of a person under investigation. Hale v. Henkel, 201 U.S. 43, 74–75, 26 S.Ct. 370, 50 L.Ed. 652 (1906); Wilson v. United States, 221 U.S. 361, 382–383, 31 S.Ct. 538, 55 L.Ed. 771 (1911); Wheeler v. United States, 226 U.S. 478, 489–490, 33 S.Ct. 158, 57 L.Ed. 309 (1913); Essgee Co. of China v. United States, 262 U.S. 151, 158, 43 S.Ct. 514, 67 L.Ed. 917 (1923); United States v. White, 322 U.S. 694, 699, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944); United States v. Foster, 4 Cir., 309 F.2d 8, 14 (1962).

■ The motions allege deprivation of rights secured by the Fourth Amendment. In each instance, therefore, the particular defendant must show that he is "a person aggrieved by an unlawful search and seizure", Rule 41, F.R.Crim. P., that is: (1) that he has standing to move to suppress the records in question; and (2) that the records were obtained as the result of an unlawful search and seizure.

I have concluded that under the facts and the law, discussed below: (1) none of the defendants has the requisite standing to rely on the grounds which he has raised, except the claim that Postal Inspector Murray and Assistant United States Attorney Sachs conspired to abuse the grand jury process; and (2) whether

or not they have the requisite standing, defendants are not entitled to an order suppressing any of the evidence, because there was no unreasonable search and seizure, no abuse of the grand jury process, and no other violation of any constitutional right.

## B. Records of Security Financial Insurance Corporation (SFIC)

### B.-1. Standing

#### Facts

The indictment charges, inter alia, that Grow controlled certain associations for certain periods, that Mensik controlled certain associations for certain periods, and that all six defendants organized SFIC and caused it to do certain things. Particulars furnished and information supplied by the government state in greater detail what the government intends to prove in support of those allegations, e. g. that Mensik and Grow controlled SFIC through ownership of its stock by other corporations which they respectively controlled. With one or two minor exceptions, none of the defendants has admitted the truth of any of those allegations, but defendants contend that they are entitled to have the allegations considered as facts in support of their motions to suppress, relying upon Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). Whether or not that reliance is justified, the evidence offered at the hearings supports the inference that the alleged domination and control of certain associations by Grow and Mensik respectively existed, and that Culver, Boone and McGurren were officers or directors of or attorneys for SFIC at various times. The evidence further shows that postal inspectors and several grand juries in this district had been investigating mail frauds by associations and insurance companies since 1958, that defendants herein had been under investigation for mail fraud in connection with SFIC or the associations it insured before the SFIC records were produced in response to the grand jury subpoenas issued in June 1962, and that Postal Inspector Murray felt that there was reason to believe that these defendants and others, including SFIC, were guilty of mail fraud in connection with the operations of SFIC.

But there is *no* allegation or evidence that any defendant maintained his personal office in any office of SFIC or in any office of any association, or kept any of his personal papers in any such office, or was ever present when any paper was obtained by a postal inspector.[4]

#### Discussion

█ It has long been recognized that: "When a man chooses to avail himself of the privilege of doing business as a corporation, even though he is its sole shareholder, he may not vicariously take on the privilege of the corporation under the Fourth Amendment * * *." Lagow v. United States, 2 Cir., 159 F.2d 245, 246, cert. den. 331 U.S. 858, 67 S.Ct. 1750, 91 L.Ed. 1865, rehearing den. 332 U.S. 785, 68 S.Ct. 32, 92 L.Ed. 368, quoted with approval in United States v. Guterma, 2 Cir., 272 F.2d 344, 346. See also Wilson v. United States, 221 U.S. 361, 376, 31 S.Ct. 538, 55 L.Ed. 771 (1911); United States v. White, 322 U.S. 694, 704, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944); United States v. H. J. K. Theatre Corp., 2 Cir., 236 F.2d 502, 506 (1956); United States v. De Vasto, 2 Cir., 52 F.2d 26, 29, 78 A.L.R. 336 (1931); Christianson v. United States, 8 Cir., 226 F.2d 646, 654 (1955); United States v. Friedman, D.N.J., 166 F.Supp. 786, 789 (1958), and cases cited in those opinions.

This rule has not been changed by Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). In that case the defendant was charged with possession of narcotics, whose seizure he moved to suppress. Proof of his ownership of the seized property or a possessory interest in the premises searched—i. e. standing—was tanta-

---

4. These facts distinguish this case from the Hanzel, Hopps and Kanan cases, cited by defendants and discussed below.

mount to proof of guilt. In order to free defendant from this dilemma, the Supreme Court held that where possession both convicts and confers standing, a defendant need not make a preliminary showing of an interest in the premises searched or the property seized. As a second ground sustaining the defendant's standing, the Court held that defendant's presence in the apartment with the permission of the person whose apartment it was made out a sufficient interest in the premises to constitute him a "person aggrieved" by the search.[5] There is nothing in the opinion to indicate that the Court intended to overrule Lagow and Guterma, and other cases to the same effect. See United States v. Fago, 2 Cir., 319 F.2d 791 (1963), decided after Jones.

Defendants' claim of standing in the instant case is not supported by Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). The assertion of the Fourth Amendment right in that case was made by the corporation itself and by one of its officers, on whom subpoenas had been served, calling on them to produce the corporate books. The individual rights of the officer were not discussed. Moreover, in that case the office ransacked had been his office as well as that of the corporation.

Shortly after the Silverthorne case, the Supreme Court decided Essgee Co. of China v. United States, 262 U.S. 151, 43 S.Ct. 514, 67 L.Ed. 917 (1923), in which after distinguishing Silverthorne, pp. 156 and 157, the Court said, p. 158 [43 S.Ct. pp. 516–517, 67 L.Ed. 917]:

"Schratter joined with each corporation in asking a return of the documents and papers of that corporation on the ground that they might incriminate him. But the cases of Hale v. Henkel, 201 U.S. 43

[26 S.Ct. 370, 50 L.Ed. 652]; Wilson v. United States, 221 U.S. 361 [31 S.Ct. 538, 55 L.Ed. 771]; and Wheeler v. United States, 226 U.S. 478 [33 S.Ct. 158, 57 L.Ed. 309], show clearly that an officer of a corporation in whose custody are its books and papers is given no right to object to the production of the corporate records because they may disclose his guilt. He does not hold them in his private capacity and is not, therefore, protected against their production or against a writ requiring him as agent of the corporation to produce them.

"Appellants cite the cases of Boyd v. United States, 116 U.S. 616 [6 S. Ct. 524, 29 L.Ed. 746]; Weeks v. United States, 232 U.S. 383 [34 S.Ct. 341, 58 L.Ed. 652], to support their contention that the proceedings complained of herein violate their rights under the Fourth and Fifth Amendments. Those cases were all unreasonable searches of documents and records belonging to individuals. The distinction between the cases before us and those cases lies in the more limited application of the Amendments to the compulsory production of corporate documents and papers as shown in the Henkel, Wilson and Wheeler cases."

In Henzel v. United States, 5 Cir., 296 F.2d 650 (1961), the person who sought suppression of records was the organizer, sole stockholder and president of the corporation. He had prepared much of the material seized, and that material was kept in his office along with some of his personal belongings. Although he was temporarily absent from his office when it was searched, he spent the greater part of every average working day there. Moreover, it was undisputed that the search by the postal inspector was "di-

---

**5.** The Court reiterated the general rule: "In order to qualify as a 'person aggrieved by an unlawful search and seizure' one must have been a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else." 362 U.S. at 261, 80 S.Ct. at 731, 4 L.Ed.2d 697.

rected at" him. Under those facts—quite different from those in the instant case—the Fifth Circuit held that he had standing, but cautioned that each case must be decided on its own facts. That caveat was observed in the later case of Peel v. United States, 5 Cir., 316 F.2d 907, 909 (1963), cert. den. 84 S.Ct. 174, where the Fifth Circuit also noted that the Jones case did not cover the factual situation there presented.

In United States v. Hopps, D.Md., 215 F.Supp. 734 (1962), now on appeal, the office from which the papers were taken was also the personal office of Hopps, and some of his personal papers were taken. With respect to the papers of certain corporations which Hopps owned or controlled, this Court said that Hopps had standing to attack an allegedly unlawful search and seizure of those papers at his office (215 F.Supp. p. 748); but, quoting Lagow and Guterma, said that he had such standing only to raise any rights which he himself might have with respect to such papers, and not to rely on the possible rights of the respective corporations (215 F.Supp. p. 750). The opinion would have been clearer if paragraph (3) on p. 750 of 215 F.Supp. had been placed in the portion of the opinion headed "Standing". I adhere to the view set out in the passage from Lagow, quoted above and in the Hopps opinion. Hopps would have had standing to raise such a contention as is made by McGurren in the instant case—that a postal inspector and an assistant United States attorney engaged in a conspiracy directed at him to abuse the grand jury process—if the facts in that case had supported such a contention. But Hopps could not rely on the privileges, if any, of the respective corporations. A fortiori, defendants cannot do so in the instant case, where the corporations' offices were not their offices and none of their papers were taken.

In United States v. Kanan, No. C–16284, D.Ariz., filed August 9, 1963, discussed more fully below in connection with the right of a receiver to make corporate records available to a federal agent, the district judge held that the defendants had standing to assert motions to supress not only their personal papers, but also the records of a corporation in receivership, which had been made available to a federal agent by the State Court receiver. The opinion does not state the relationship of the defendants to the corporation, but implies that they were officers. It states: "Individual officers have been permitted to question the seizure of corporate records," citing Silverthorne and Henzel, and states that Jones broadens the class of persons who are entitled to move to suppress evidence. This Court cannot agree that those authorities support the conclusion that on the facts stated in the opinion in United States v. Kanan [6] the individual defendants had standing to have the corporate record suppressed. That conclusion is contrary to the many Supreme Court and Courts of Appeals cases cited above.

 I conclude: that none of the defendants in the case at bar has established that he himself was the victim of an invasion of privacy; that the defendants may not rely on the privileges, if any, of the respective corporation; and that none of the defendants has standing to rely on the points raised by the motions to suppress the corporate records. Defendants have standing, however, to press the argument that a postal inspec-

---

6. Counsel for Grow herein, who was counsel for Kanan in that case, states that four of the defendants were regularly engaged, as officers or employees, in the office of the association. Even so, they would not have standing with respect to the corporate papers under Lagow and the cases upon which it is based and the cases which have followed it. But the additional facts stated by counsel would distinguish Kanan from this case. Under McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 93 L.Ed. 153 (1948), if any defendant was entitled to have the property seized returned to him, it could not be used against the other defendants over their objection. This principle was not discussed in the Kanan opinion, but may have been considered.

tor and an assistant United States attorney conspired to abuse the grand jury process.

### B.2.—Acquisition of Records of SFIC and Its Accountant

#### Facts

Since 1958 the Baltimore postal inspectors have been investigating possible violations of 18 U.S.C.A. § 1341 by savings and loan associations and insurance companies.[7] The investigation of SFIC, which insured a number of the associations under investigation, began in 1959. During the period 1960–62 postal inspectors interviewed defendant Culver, then president of SFIC, and defendants Grow, McGurren and Boone with regard to their relationship to the corporation.

On May 15, 1962, postal inspectors visited K. George Christian, then president of SFIC, and asked him to make available for examination certain records of that company. On advice of counsel, Christian refused to allow any examination of the SFIC records. Up to that time the postal inspectors had never seen any records of SFIC, but had obtained information about its operations from advertising literature of various associations, from evidence produced in other cases, from published financial statements of SFIC, from newspaper advertisements, and from interviews with some of the defendants and other persons.

Murray knew that SFIC was insuring certain associations which had previously been insured by both International Guaranty Insurance Company of Tangier, Morocco (see United States v. Hopps, D.Md., 215 F.Supp. 734), and Financial Guaranty & Insurance Company of Tangier. He was familiar with the operations of both those companies.

He had concluded that there was sufficient reason to believe that defendants and others, including SFIC, had violated the mail fraud statutes in connection with the operation of SFIC. He was seeking records of SFIC to complete his investigation.

The refusal of Christian to make the SFIC records available was reported to the office of the United States Attorney for this District. About three weeks later an Assistant United States Attorney caused the Clerk of this Court to issue a subpoena duces tecum addressed to Christian, as president of SFIC, calling for the production of specified corporate records of SFIC before the June 1962 Term Grand Jury for this District on June 14. Attorneys for Christian filed a motion to quash the subpoena,[8] which was heard by Judge Winter on June 13 and was denied. On June 14 Christian, accompanied by Rosche, Secretary-Treasurer of SFIC, brought a filing cabinet and a drawer of records to the corridor outside the grand jury room and Christian took them into the room. Assistant United States Attorney Sachs informed the grand jury of the nature of the investigation about to be undertaken and its background. Christian and Rosche identified the records called for by the subpoena,[9] and were informed that the records would be returned as soon as possible. The grand jury did not examine the records at length on June 14, but after the witnesses had been dismissed made the records available to Sachs for further examination. He turned them over to Postal Inspector Murray, with instructions to examine them and make copies of such of them as would assist the grand jury in its investigation. The records were kept in the United States Post Office and Courthouse, at Baltimore, in a room to which both Sachs and Murray had access.

---

7. Before the indictment in this case, eight indictments for mail fraud had been filed against various individuals and corporations, some of which resulted in convictions.

8. On the ground that it was unreasonably broad.

9. All of the records called for had been produced, except current check books which were needed for day to day operations.

In 1960 Inspector Murray had learned from public financial statements of SFIC and from advertisements of various associations that Bernard S. Aiken, an accountant, was examining the records of certain insured associations for SFIC. Aiken confirmed the fact but refused to allow Murray to examine the records without the consent of his client, SFIC, asserting an accountant-client privilege. Murray informed Sachs of Aiken's position, and Sachs caused a subpoena duces tecum to be issued and served on Aiken directing him to produce before the grand jury on June 19, 1962, all reports of audits and examinations which he had made of SFIC and of the associations it insured. On June 18 a motion to quash that subpoena was filed by Aiken's attorney. After a hearing before Judge Winter, the motion was denied. On June 19 Aiken produced and identified to the grand jury the records called for in the subpoena. These records were also turned over to Sachs for examination and were made available to Inspector Murray for examination and copying.

Aiken's records have been in the hands of the government since they were subpoenaed, but they have been at all times available to all defendants and their counsel for examining and copying. They were kept in the same room in which the SFIC records were kept. No request for their return has ever been made by Aiken or SFIC.

After repeated requests by Christian for the return of the records of SFIC, as necessary for the day to day operations of the corporation, but before the examination of those records could be completed, the government returned the records to Christian, upon his voluntary written agreement, dated June 29, 1962, to allow the postal inspectors to examine the records further at the offices of SFIC. Pursuant to that agreement, Inspectors Hahn and Murray visited the SFIC office on several occasions, and SFIC records were made available to them for examination and copying.

On July 26, 1962, on the petition of the Insurance Commissioner of the State of Maryland and the answer of SFIC, and after a hearing at which evidence was taken, the Circuit Court of Baltimore City assumed jurisdiction over the property and business of SFIC for final liquidation, and appointed Deputy Insurance Commissioner John H. Coppage as Receiver of SFIC, to take possession of its property and to accomplish its orderly liquidation under the jurisdiction of the Court.

On several occasions after his appointment, the Receiver made available to postal inspectors various records of SFIC to be examined and copied, for use before the grand jury which returned the indictment in this case.

The examination of the records had not been completed before the first Monday in September 1962, when the term of the June 1962 Grand Jury expired.[10] Murray did not testify before the grand jury, and it took no action on the evidence which had been presented to it. The September 1962 Grand Jury undertook an investigation of SFIC and related matters and heard witnesses in connection therewith on at least twelve days. The term of the September 1962 Grand Jury was extended by order of Court until March 2, 1963, and it brought in the pending indictment on February 19, 1963.

On March 1, 1963, the United States Attorney submitted to Judge Watkins, who presided at the arraignments in this case, a proposed timetable calling for the trial to begin around the first of June 1963,[11] which the Court hoped might be feasible. On March 29, 1963, Assistant United States Attorneys Sachs and Civiletti went to the office of Receiver Coppage and obtained photocopies of certain

10. Grand juries in this District serve a three-month term, beginning on the first Monday in March, June, September and December, unless their term is extended, or a special grand jury is organized.

11. At that time the defendant Boone was urging an early trial date.

correspondence and some original receipts and petty cash vouchers. On April 23, 1963, a trial subpoena duces tecum was issued and served on the Receiver for SFIC, to appear on June 3, 1963, to testify and to bring with him all books and records of SFIC in his possession. Pursuant to that subpoena the Receiver forwarded all the books and records of SFIC in his possession to the United States Attorney's office by the means of Post Office personnel which Inspector Murray furnished to him for his convenience.

These records have since remained in the custody of the United States Attorney's office in Room 331, Post Office—U. S. Courthouse Building, in Baltimore, and have been available to defendants for examination, inspection and copying. Neither the postal inspectors nor the Assistant United States Attorneys ever obtained a search warrant or an order of the State Court directing the Receiver to permit the examination of the records. No motion to quash the trial subpoena issued and served on Receiver Coppage has been filed. Prior to the motion to suppress, none of the defendants had ever complained about the acquisition of any records of SFIC.

### Discussion
#### (a) Alleged Abuse of Grand Jury Process

Counsel for defendant McGurren has accused Postal Inspector Murray and Assistant United States Attorney Sachs of entering into a conspiracy to deprive defendants of their constitutional rights. The other defendants have contented themselves with a charge of abuse of process on the grounds: (1) that no bona fide investigation of SFIC was being conducted by the grand jury when the subpoenas in question issued; and (2) that the records obtained pursuant to the subpoenas were immediately made available for the use of postal inspectors.

The following opinions review the history and functions of the grand jury in the federal courts: United States v. United States District Court, 4 Cir., 238 F.2d

713 (1957), cert. den. sub. nom. Valley Bell Dairy Co. v. United States, 352 U.S. 981, 77 S.Ct. 382, 1 L.Ed.2d 365; Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906); United States v. Thompson, 251 U.S. 407, 40 S.Ct. 289, 64 L.Ed. 333 (1920); Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956); In re April 1956 Term Grand Jury, 7 Cir., 239 F.2d 263 (1956); United States v. Smyth, N.D.Cal., 104 F.Supp. 283 (1952); United States v. Invader Oil Co., S.D.Cal., 5 F.2d 715 (1925).

It is not necessary that an inquiry be initiated by a grand jury before a subpoena to produce records for consideration by it may be issued. It is normal practice for the United States Attorney and other law enforcement officers to bring matters to the attention of the grand jury and to cause subpoenas to be issued for witnesses and records. United States v. Thompson, 251 U.S. at 413, 40 S.Ct. at 291–292, 64 L.Ed. 333; In re April 1956 Term Grand Jury, 239 F.2d at 268; Wilson v. United States, 221 U.S. 361, 372, 31 S.Ct. 538, 55 L.Ed. 771 (1910); Blair v. United States, 250 U.S. 273, 282, 39 S.Ct. 468, 63 L.Ed. 979 (1918); United States v. Invader Oil Corp., 5 F.2d at 716, 717; United States v. Morton Salt Co., D.Minn., 216 F.Supp. 250, 256 (1962).

Defendants cannot complain because the records were turned over by the grand jury to Assistant United States Attorney Sachs and by him to a postal inspector for winnowing and copying preparatory to their consideration by the grand jury. United States v. United States District Court, 238 F.2d at 723; In re April 1956 Term Grand Jury, 239 F.2d at 272.

The fact that the grand jury for which the documents were originally subpoenaed was discharged after its normal three months term did not prevent a subsequent grand jury from considering the same subject and returning a true bill. United States v. Thompson, 251 U.S. 407, 413, 40 S.Ct. 289, 64 L.Ed.

333 (1920); Petition of Borden Co., N. D.Ill., 75 F.Supp. 857, 863, 864 (1948); In re Grand Jury Investigation of Banana Industry, D.Md., 214 F.Supp. 856 (1963).

The cases cited by defendants, Durbin v. United States, 94 U.S.App.D.C. 415, 221 F.2d 520 (1954), and In re National Window Glass Workers, N.D.Ohio, 287 F. 219 (1922), support the proposition that the court has power to curb an abuse or misuse of grand jury process, but they do not support the argument that there was any abuse or misuse in this case. After considering all the facts and arguments, I find that there was no abuse or misuse of grand jury process.

*(b) Breadth of Subpoenas*

 Although a subpoena may be so broad as to be unreasonable or oppressive and constitute an unreasonable search and seizure, each case must depend upon its own facts. Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652, (1906); United States v. United States District Court, 4 Cir., 238 F.2d 713, 723 (1956); Petition of Borden Co., N.D. Ill., 75 F.Supp. 857, 863–64 (1948); In re Motions to Quash Subpoenas Duces Tecum Returnable Before The Second Grand Jury, S.D.Cal., 30 F.Supp. 527, 531 (1939). In Schwimmer v. United States, 8 Cir., 232 F.2d 855, p. 862 (1956), the Court said:

"Relevance and materiality necessarily are terms of broader content in their use as to a grand jury investigation than in their use as to the evidence of a trial. They must be given practical meaning in relation to the functions which a grand jury is designed to serve and to the realities which are necessary in any expeditious carrying-on of its operations. Thus, a grand jury has no catalog of what books and papers exist and are involved in a situation with which it is attempting to deal, nor will it ordinarily have any basis for knowing what their character or contents immediately are. It can therefore hardly be expected to be able to designate or call for what its exact needs may ultimately turn out to be. And since the path which it is entitled to travel in its search for probable cause has no general limits except those of reasonableness on the entirety of the situation being pursued, it obviously has a right, as against the objection of unreasonable search and seizure, to a fair margin of reach and material in seeking information, not merely direct but also as a matter of possible light on seemingly related aspects whose significance it is seeking to uncover. Some exploration or fishing necessarily is inherent and entitled to exist in all documentary productions sought by a grand jury."

 Upon consideration of the nature of the investigation, the indication that some at least of the defendants were interested in both SFIC and in insured associations, and other relevant factors, I conclude that the subpoenas addressed to Christian and Aiken were not unreasonably broad. The question was presented to Judge Winter, who denied motions to quash the subpoenas based on that ground. The subsequent claim of Christian that the subpoena addressed to him was burdensome to the company was cured by the return of the records, discussed in (d) below.

The subpoena addressed to the Receiver for SFIC was not so broad as to violate the Fourth Amendment. The Receiver has not complained that it has been burdensome or oppressive to him or to anyone else, and the records have at all times been available to defendants and their counsel.

*(c) The Accountant-Client Privilege*

 The records which the accountant Aiken was called upon to produce by the subpoena duces tecum addressed to him included all reports of audits and examinations which he had made of SFIC and of the associations insured by it. His motion to quash the subpoena based on the claimed accountant-client privilege was denied by Judge Winter. That rul-

ing is supported by the following considerations:

Art. 75A, sec. 20 of the Maryland Code,[12] upon which defendants rely for their claim of privilege, provides specifically that nothing in that section "shall be taken or construed as modifying, changing or affecting the criminal laws of this State".

Rule 26, F.R.Crim.P., states: "The admissibility of evidence and the competency and privileges of witnesses shall be governed, except when an act of Congress or these rules otherwise provide, by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."

■ There is no accountant-client privilege at common law, and none is recognized in federal courts. Himmelfarb v. United States, 9 Cir., 175 F.2d·924, 939 (1949), cert. den. 338 U.S. 860, 70 S.Ct. 103, 94 L.Ed. 527; Brown v. United States, 6 Cir., 224 F.2d 845, 848 (1955), cert. den. 350 U.S. 912, 76 S.Ct. 196, 100 L.Ed. 800; United States v. Stoehr, M. D.Pa., 100 F.Supp. 143, 162 (1951), aff'd 3 Cir., 196 F.2d 276, 33 A.L.R.2d 836, cert. den. 344 U.S. 826, 73 S.Ct. 28, 97 L.Ed. 643; Gariepy v. United States, 6 Cir., 189 F.2d 459, 464 (1951); United States v. Chin Lim Mow, N.D.Cal., 12 F. R.D. 433 (1952).

■ A state-created accountant-client privilege is not applicable in a federal criminal trial. Petition of Borden Co., N.D.Ill., 75 F.Supp. 857, 859 (1948); Falsone v. United States, 5 Cir., 205 F. 2d 734 (1953). See generally 8 Wigmore, Evidence (McNaughton Rev.1961), sec. 2286, note 13. The rule might be different in diversity cases. Palmer v. Fisher, 7 Cir., 228 F.2d 603, 608 (1956).

### (d) Christian's Consent

■ Upon Christian's insistence that the records of SFIC were necessary for the conduct of the company's business, the records were returned to the company after 15 days, although the United States Attorney might have retained possession of the records for a longer period in order to complete the examination he was causing to be made for the grand jury, which had not yet been dismissed. Cf. Application of Bendix Aviation Corp., S.D.N.Y., 58 F.Supp. 953, 954 (1945). The records were returned as a favor to SFIC and for its benefit, upon the written agreement of its president that the records might be examined further in the offices of the company. The president had implied authority to make such an agreement, and such further examination did not deprive SFIC, much less defendants, of any constitutional right. United States v. H. J. K. Theatre Corp., 2 Cir., 236 F.2d 502, 506 (1956); 4 Wharton's Criminal Procedure, 1957 ed., secs. 1578, 1579; United States v. Eldridge, 4 Cir., 302 F. 2d 463, 465 (1962); United States v. Antonelli Fireworks Co., 2 Cir., 155 F.2d 631, 636 (1946).

### (e) Receiver's Consent to Inspection and His Response to Subpoena

■ After considering all the facts,[13] and the applicable state and federal law, this Court concludes that the Receiver of SFIC had authority to make the records in his possession available to the postal inspectors and to the Assistant United States Attorneys.

The Receiver had acquired possession of the records by lawful means, for a

---

12. "Confidential communications.

"Except by express permission of the person employing him, or of the heirs, personal representatives or successors of such person, a certified public accountant or public accountant or any person employed by him shall not be required to, and shall not voluntarily, disclose or divulge the contents of any communication made to him by any person employing him to examine, audit or report on any books, records, accounts or statements nor any information derived therefrom in rendering professional service; provided that nothing in this section shall be taken or construed as modifying, changing or affecting the criminal laws of this State or the bankruptcy laws."

13. Summarized under the heading "Facts", above.

proper state purpose. There had been no force, fraud, trickery or abuse of process. Davis v. United States, 328 U.S. 582, 590, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946); Wilson v. United States, 221 U.S. 361, 380–382, 31 S.Ct. 538, 55 L.Ed. 771 (1911); Boyd v. United States, 116 U.S. 616, 623–624, 6 S.Ct. 524, 29 L.Ed. 746 (1886); Johnson v. United States, 228 U.S. 457, 459, 33 S.Ct. 572, 57 L.Ed. 919 (1913); Ex parte Fuller, 262 U.S. 91, 93–94, 43 S.Ct. 496, 67 L.Ed. 881 (1923); Dier v. Banton, 262 U.S. 147, 149–150, 43 S.Ct. 533, 67 L.Ed. 915 (1923); In're Bob, 2 Cir., 76 F.2d 131 (1935); United States v. Hoyt, S.D.N.Y., 53 F.2d 881, 886 (1931).

This Court construes the order appointing the Receiver as not requiring the Receiver to seek the Court's permission before allowing such examination. Making the records available to the government investigators was not inconsistent with the purpose of the receivership. On the contrary, the statute under which the receivership action was taken contemplates that the receiver of an insurance company can and should cooperate with federal officials investigating crime.

Art. 48A, sec. 59 of the Anno.Code of Maryland (1957 ed.), provides that the Insurance Commissioner or his deputy be appointed receiver. Among the duties of the Insurance Department are investigating cases of alleged fraud and misrepresentation on the part of insurers and assisting "law enforcement officials in the prosecution of such cases". Art. 48A, sec. 10. See also secs. 12, 47, 53, 57.[14] Upon being appointed a receiver under sec. 59, neither the Insurance Commissioner nor his deputy ceases to possess the powers granted by the Insurance Code. Insurance companies and savings and loan associations, like banks and railroad companies, are corporations clothed with a public interest and a responsibility to the public.

Moreover, the Receiver had the right to honor the June 29, 1962, agreement by Christian, the president of SFIC, to permit examination of SFIC records by postal inspectors.

Defendants rely on Blum v. State, 94 Md. 375, 51 A. 26, 56 L.R.A. 322 (1902), to support their argument that a Maryland state court receiver has no authority to permit the records in his possession to be used in a criminal prosecution. The Blum case did not involve corporate records, but the books and papers of a partnership. The Court held that, under the circumstances of that case, to permit the receiver to produce them in evidence in a criminal prosecution would have been equivalent to an order of court directed to the traverser, commanding him to produce the books and papers to be used in evidence for the State. See discussion of Blum in Archer v. State, 145 Md. 128, 142 et seq., 125 A. 744 (1924). In Archer, the Maryland Court refused to follow the Blum rule, quoting Johnson v. United States, 228 U.S. 457, 458–459, 33 S.Ct. 572, 57 L.Ed. 919 (1913), where the Supreme Court, speaking through Mr. Justice Holmes, had said: " 'A party is privileged from producing the evidence, but not from its production. The transfer by bankruptcy is no different from a transfer by execution of a volume with a confession written on the fly leaf. It is held that a criminal cannot protect himself by getting the legal title to corporate books. But the converse proposition is by no means true, that he may keep the protection from the introduction of documentary evidence that he would have had while he retained it, after the title and possession have gone to some one else. It is true that the transfer of the books may have been against the defendant's will, but it is compelled by the law as a necessary incident to the distribution of his property, not in order to obtain criminal evidence against him. Of course, a

14. Fraudulent management was alleged and found in the receivership proceedings. Insurance Commissioner, State of Maryland v. Security Financial Insurance Corporation, Cir.Ct. of Baltimore City, A42923/102A/480 (Memorandum Opinion by Judge Prendergast); Security Financial Insurance Corporation v. Insurance Commissioner, State of Maryland, 231 Md. 571, 192 A.2d 95 (1963).

man cannot protect his property from being used to pay his debts by attaching to it a disclosure of crime. If the documentary confession comes to a third hand *alio intuitu*, as this did, the use of it in court does not compel the defendant to be a witness against himself.' " 145 Md. at 143, 125 A. at 744.

In Dier v. Banton, 262 U.S. 147, 43 S. Ct. 533, 67 L.Ed. 915 (1923), the Supreme Court said that partners whose partnership books were in the hands of a bankruptcy receiver could not enjoin their production by the receiver before a state grand jury on Fourth or Fifth Amendment grounds. It was held irrelevant that the receiver's interest in the books and records was possessory only (262 U.S. p. 149, 43 S.Ct. p. 534, 67 L.Ed. 915).[15] The Court said (262 U.S. p. 150, 43 S.Ct. p. 534, 67 L.Ed. 915): "He has lost any right to object to their use as evidence because, not for purpose of evidence, but in the due investigation of his alleged bankruptcy and the preservation of his estate pending such investigation, the control and possession of his books and papers relating to his business were lawfully taken from him."

Defendants read Dier v. Banton as supporting their argument that a receiver may make records in his custody available to officials investigating crime only after an intervening judicial determination. In United States v. Kanan, No. C–16284, D.Ariz., filed August 9, 1963, on which defendants also rely, the district judge said: "The distinction between this case and Dier is that in the Dier case there was an application to the court for use of the books and papers which were in the control of the court."

A careful reading of Dier, however, makes it clear that the Court did not lay down the rule that records in the hands of a receiver can never be made available to officials investigating crime without the consent of the Court appointing the receiver or other intervening judicial determination; at most, the Court held that records in the custody of a bankruptcy court cannot be taken therefrom by subpoena of a state court except with the consent of the federal court. 262 U.S. at 151, 43 S.Ct. at 534, 67 L.Ed. 915.

The decision in the Kanan case turned upon (1) the particular wording of the order appointing the receiver, (2) a decision of the Supreme Court of Arizona limiting the authority of a receiver in another case [16] (which decision I do not believe to be in accord with the statutory and case law of Maryland) and (3) the district judge's apparent belief that he should follow state law not only in deciding the power of a receiver under state law, but also in deciding whether records in the hands of a state court receiver are admissible in evidence in a federal criminal prosecution. This Court believes that in deciding the latter question a federal court should follow federal law, as laid down in such cases as Johnson v. United States, 228 U.S. 457, 33 S.Ct. 572, 57 L.Ed. 919 (1913); Dier v. Banton, 262 U.S. 147, 43 S.Ct. 533, 67 L.Ed. 915 (1923); In re Bob, 2 Cir., 76 F.2d 131 (1935); United States v. Hoyt, S.D.N.Y., 53 F.2d 881 (1931). Those cases were cited and followed by this Court in United States v. Hopps, D.Md., 215 F.Supp. at 747. See also Ex parte Fuller, 262 U.S. 91, 43 S.Ct. 496, 67 L.Ed. 881 (1923). Furthermore, those cases are not inconsistent with the Maryland law, as indicated by the Maryland statutes and such cases as Archer v. State, 145 Md. 128, 125 A. 744, in which the Maryland Court quoted and followed Johnson v. United States, 228 U.S. 457, 33 S.Ct. 572, 57 L.Ed. 919.

Archer and Johnson were partnership cases. *A fortiori*, the receiver of a corporation (which, unlike a partner, can assert no Fifth Amendment right to prevent the inspection of its records) could make the records of the corporation in his possession available to investigating officers and could respond to the subpoena issued by this Court. The Receiver vio-

15. See also Matter of Harris, 221 U.S. 724, 31 S.Ct. 557, 55 L.Ed. 732 (1911).

16. Stowell v. Arizona Savings & Loan Assn., 93 Ariz. 310, 380 P.2d 606 (1963).

lated no constitutional rights of the defendants.

### C. Records of Savings and Loan Associations

#### 1. Standing

None of the defendants offered any evidence which would support a claim of standing to challenge the production of the corporate records of any association. In each case they rely on (1) the allegations of the indictment that Grow dominated the business and affairs of First Guarantee until about September 29, 1961, and of First Fidelity until about April 15, 1961, and that Mensik dominated and controlled the business and affairs of Commercial until about June 13, 1962, of Maryland District until after July 27, 1962, and of Maryland Thrift until about May 24, 1962; and (2) the particularization of those allegations by the government's stating that Grow and Mensik respectively owned the guarantee stock in the several associations, directly or indirectly, and directed the conduct of their respective businesses and affairs. Whether or not defendants may rely on those allegations, the allegations do not amount to proof of standing, for the reasons set out under the heading "Generally", in "A" above, and under the headings "Facts" and "Discussion" on the question of standing in connection with the records of SFIC, "B–1", above.

#### 2. Acquisition of Records

#### (a) First Guarantee

On November 25, 1961, the Director of the State Department of Assessments and Taxation was appointed Conservator of First Guarantee by order of the Circuit Court of Baltimore City, with all powers conferred by Art. 23, sec. 161K of the Anno.Code of Maryland (Supp.). First Guarantee had waived its right to a final order of the Department and a hearing thereon.

The records in question, which were corporate records, were made available to the postal inspector by the Conservator on April 6, 1962.

Subsection (b) of sec. 161K, which is part of the so-called Case Act, for the regulation of savings and loan associations, passed in 1961, provides that " * * any conservator appointed shall have all the rights, powers, [and] privileges possessed by the officers, board of directors, and members of the association". The Director is authorized to seek a conservatorship if he finds that an association (1) is insolvent, (2) is in violation "of any valid and applicable law or regulation", (3) is concealing any of its assets, books or records, or (4) is conducting an unsafe or unsound operation. It would be inconsistent with the regulatory purpose of the Case Act to hold that the Director cannot bring evidence of crime to the attention of law enforcement officials or make the records of the association available to them.

For the foregoing reasons and for the reasons set out in II B 2(e), immediately above, dealing with the records obtained from the Receiver of SFIC, there was no violation of any constitutional right in connection with the obtaining of records from the Conservator of First Guarantee.

#### (b) First Fidelity

As a result of advertisements featuring a long, continuous history of dividend payments, which the postal inspectors felt was unjustified,[17] a grand jury investigation of First Fidelity and other associations was begun in 1960.

(b–1) A grand jury subpoena duces tecum was issued in August 1960 to Harold Applegarth, its president, calling for production before the grand jury of specified records. In response to this subpoena, Thomas P. Raimondi, attorney for First Fidelity, requested that the records subpoenaed be turned over to the United States Attorney's office rather than produced by an officer of First Fidelity into the grand jury room, in order

---

17. The details are set out in the findings of fact filed with the Clerk.

to avoid possible unfavorable publicity which might arise from the Associations' representatives appearing in the corridor adjacent to the grand jury room and entering that room. Arnold M. Weiner, Esq., Assistant United States Attorney, acceded to the request and the records were produced to him.

This procedure is not uncommon in this District, and is within the scope of the authority of an attorney to bind his client on procedural matters. 5 Am.Jur. (Attorneys at Law, secs. 85, 86, 91) pp. 311–315. Moreover, First Fidelity's three year silence on the matter indicates that it has ratified Raimondi's act.

■ (b–2) On June 2, 1962, the Director of the State Department of Assessments and Taxation was appointed Conservator of First Fidelity by order of the Circuit Court of Baltimore City, with the powers conferred by Art. 23, sec. 161K noted above. On or about September 11, 1962, a representative of the Conservator made available to Inspector Murray certain corporate records in his hands. This action violated no constitutional rights. See discussion under "(a) First Guarantee", above.

■ (b–3) Early in January 1963, a subpoena ad testificandum was served on Raimondi to appear before the grand jury on January 8. Raimondi had been chairman of the board of First Fidelity for a time, as well as its counsel. On January 4, Raimondi appeared in the office of the United States Attorney with his counsel, M. William Adelson. During the course of the interview he informed Assistant United States Attorneys Sachs and Civiletti and Inspector Murray that he had some records relating to First Fidelity and volunteered to produce them. The next day Raimondi and Adelson returned to the office of the United States Attorney and made available certain records which may well have been original records of First Fidelity, but were not the personal property of any of the defendants in this case. In the absence of wrongdoing by the government or by the State, there is no constitutional principle which requires the government to surrender the papers under such circumstances. Burdeau v. McDowell, 256 U.S. 465, 476, 41 S.Ct. 574, 65 L.Ed. 1048 (1921). See also Remmer v. United States, 9 Cir., 205 F.2d 277, 285 (1953).

■ (b–4) At the request of the United States Attorney's office, acting out of a superabundance of caution, after the pending motions were filed, the Receiver for First Fidelity (the former Conservator, who was appointed Receiver in August 1963), petitioned the Circuit Court of Baltimore City, in September 1963, to pass an order authorizing him to make available from time to time, upon request of the law enforcement agencies and officials of the State of Maryland, the City of Baltimore and the United States Government, the books and records of the association for inspection, copying, or taking temporary custody thereof by said agencies and officials for use in their investigation of certain individuals relative to the former operation of said association. It was so ordered by Judge Oppenheimer. Subsequent to that order, certain records were obtained from the Receiver of First Fidelity by the Government. Even without the order, the Receiver had the right to make those records available.

(b–5) Prior to the conservatorship of First Fidelity on June 2, 1962, but after April 15, 1961, when Grow's control is alleged to have ceased, Inspector Murray obtained from one Mobley, an officer of First Fidelity, certain records unrelated to the SFIC investigation. The government has stated that it does not intend to offer those records as evidence in this case. In any case, Mobley's consent authorized the acquisition of these records. See United States v. Eldridge, 4 Cir., 302 F.2d 463, 465, notes 4 and 5; United States v. H. J. K. Theater Corp., 2 Cir., 236 F.2d 502, 506 (1956).

For the foregoing reasons and for the reasons set out in section II B 2(e) above, dealing with the records obtained from the Receiver of SFIC, there was no violation of any constitutional right in

connection with the obtaining of records from the Conservator of First Fidelity.

*(c) Commercial*

On June 13, 1962, on the application of the Director of the State Department of Assessments and Taxation, acting under Art. 23, sec. 161L of the Anno. Code of Md. (Supp.), Commercial having appeared by counsel and by its president, the Circuit Court of Baltimore City found that an emergency existed and that the best interests of the Association and the public required the appointment of a temporary receiver. Accordingly, the Court appointed Deputy Bank Commissioner John D. Hospelhorn to be Temporary Receiver of Commercial, with full power and authority to take charge and possession of all of its real and personal property, goods, chattels, equipment, books, papers and effects, and to manage the same under the direction, supervision and further order of that Court. Officers, directors and employees of Commercial were commanded to deliver all property of Commercial to the Receiver. The Receiver was authorized to appoint and employ such managers, agents, employees, servants, accountants and counsel as might in the judgment of the Temporary Receiver be advisable or necessary in the management, conduct, control or custody of the receivership estate.

Commercial and Mensik were under indictment in the District of Maryland at the time of the receivership.

Postal Inspector Hahn visited the offices of Commercial Savings and Loan Association in the course of the investigation of SFIC. C. Raymond Frye, representative of the Receiver, furnished the record in question, check No. 397, dated January 5, 1959, to Inspector Hahn.

Thereafter, on October 9, 1962, the Circuit Court denied Commercial's petition for an injunction and motion for the dissolution of the temporary receivership, and appointed a receiver, with all the powers of receivers in such cases.

Section 161L, under which the temporary receiver was appointed, is, like sec.

161K, a part of the Case Act. As noted above, when discussing the authority of the conservator for First Guarantee, appointed under sec. 161K, it would be inconsistent with the regulatory purpose of the Case Act to hold that a temporary receiver appointed under sec. 161L cannot bring evidence to the attention of law enforcement officials or make the records of the association available to them.

For the foregoing reasons and for the reasons set out in section II B 2(e) above, dealing with the records obtained from the Receiver of SFIC, there was no violation of any constitutional right in connection with the obtaining of records from the Receiver of Commercial.

*(d) Maryland Thrift, and*
*(e) Maryland District*

As a result of advertisements similar to those referred to in the discussion of the First Fidelity records in "(b)", above, successive grand juries in this District began investigations of Maryland Thrift, Maryland District and individuals connected with those associations. A grand jury subpoena duces tecum was issued on August 20, 1960, directed to Casimir Symanski, president of Maryland District, calling for the production of the records specified therein before the grand jury on August 30, 1960. Those records were produced and identified before the grand jury and receipts given for their production.

A similar subpoena was issued in April 1960 to a representative of Maryland Thrift, calling for the production of certain records of Maryland Thrift. Those records were produced before the grand jury and receipts were given for them.

Defendants contend that grand jury subpoenas duces tecum issued in the spring and summer of 1960 constituted an abuse of process at that time and that the evidence obtained therefrom should at this time be suppressed. Without offering any evidence in support of their contention, defendants argue that these subpoenas were issued to bolster the then pending prosecution of Commercial Savings and Loan Association, et al.

If defendants' contentions were supported by facts, they might have been the basis for motions by appropriate moving parties to quash the subpoenas at the time they were issued. See In re National Window Glass Workers, N.D.Ohio, 287 F. 219 (1922). But I find as a fact that the evidence does not support the charges. It appears from the testimony of former Assistant United States Attorney Weiner and Inspector Murray that investigations of Maryland Thrift and Maryland District by the Post Office Department had begun no later than January 1960; that grand jury investigations of those associations began not later than April 1960, in the case of Maryland District, and August 1960, in the case of Maryland Thrift; and that the office of the United States Attorney was assisting the grand-jury in those inquiries, which were justified by the known facts.

For the foregoing reasons, and for the reasons set out in II B 2(a) above, discussing the alleged abuse of process in connection with SFIC, I find that there was no abuse of grand jury process in connection with the records of Maryland Thrift or Maryland District, or with any other records which have been brought to the Court's attention in this case.

There is no basis in fact or law to grant any motion to suppress.

### III. Supplemental Motion to Dismiss Indictment

Since none of the records was obtained in violation of any constitutional right, no impropriety has been shown in their consideration by the grand jury or in the consideration by the grand jury of any other evidence to which those records may have given a lead. The supplemental motion to dismiss the indictment on this ground must, therefore, be denied.

### ORDER

All motions to dismiss the indictment are hereby denied.

All motions heretofore made to suppress evidence are hereby denied.