## AIKEN v. UNITED STATES.
### No. 4498.

Circuit Court of Appeals, Fourth Circuit.
Dec. 14, 1939.

C. Granville Wyche, of Greenville, S. C., and C. Erskine Daniel, of Spartanburg, S. C. (Alfred F. Burgess, of Greenville, S.C., on the brief), for appellant.

Oscar H. Doyle, U. S. Atty., of Anderson, S. C. (Edward P. Riley and Thomas A. Wofford, Asst. U. S. Attys., both of Greenville, S. C., on the brief), for appellee.

Before PARKER and SOPER, Circuit Judges, and DOBIE, District Judge.

DOBIE, District Judge.

Defendant (appellant) was convicted in the United States District Court for the Western District of South Carolina for using the mails to defraud. 18 U.S.C.A. § 338. The indictment was in seven counts. The first and seventh counts, charging offenses under the Securities Act of 1933, 15 U.S.C.A. § 77 (q), were quashed by the trial judge; so defendant was tried and convicted under the Mail Fraud Statute on counts two to six, inclusive.

As a ground for reversal, defendant insists that the indictment is uncertain, indefinite and duplicitous. The chief basis for this attack appears to be in the fact that the alleged fraudulent scheme (an essential element in the crime for which he was convicted) was set out in the first count of the indictment (which count charged an offense under the Securities Act), and this alleged fraudulent scheme was incorporated by reference into all the succeeding counts of the indictment. In as much as the trial court quashed the only two counts dealing with the Securities Act (counts one and seven), leaving only those counts (two to six, inclusive) that charged offenses under the Mail Fraud Statute, and since defendant was tried and convicted only on these latter counts, we are not impressed by this contention. This alleged fraudulent scheme, we think, was set out in the first count of the indictment with sufficient precision and certainty to apprise defendant fully of the crime for which he was tried. And, with the counts dealing with the Securities Act eliminated, we think the incorporation by reference of the alleged scheme set out in the first count of the indictment into counts two

to six thereof was so clear and so specific as not to fall within the condemnation of Asgill v. United States, 4 Cir. 1932, 60 F.2d 780.

■ Error, too, is predicated on the entry into the juryroom of the duly qualified deputy federal marshal, charged with the care of the jury (though not specially sworn as bailiff in charge of the jury), while the jurors were deliberating over their verdict. This entry was without the consent or permission of either the Court or counsel for defendant. According to the record, the deputy marshal entered the juryroom with two pitchers of water. He did nothing to influence any member of the jury as to a verdict, he remained there less than a minute, and the only conversation between the deputy marshal and any juror was a request by a juror for cigars, a request with which the deputy marshal did not comply. Though this entry of the deputy marshal into the juryroom was under the circumstances "thoughtless and inadvertent" (as the trial judge said), we cannot, in the absence of any showing that this unfortunate episode was prejudicial to defendant, be so technical as to hold that this constituted error justifying a reversal.

■ The most difficult question in the case, one that gives us real concern, is raised by appellant's contention that there was not sufficient evidence of any fraudulent scheme to justify even the submission of this issue to the jury. On behalf of the United States it was urged that the formation of the Industrial Finance Company was without any idea of conducting any business on a scale that might have yielded real profits, but rather it was, in its inception, a scheme by which the defendant intended to defraud the public largely through subscriptions to the corporate stock. While for defendant, with equal earnestness, it is insisted that defendant organized this corporation to expand a legitimate business he had already conducted, and that the evidence shows no more than mere corporate irregularities due to the commercial ineptitude and economic ignorance of the defendant. In this connection it might be remembered that defendant was educated in the law and had held for a time a minor judicial office.

Fraudulent intent, as a mental element of crime, (it has been observed) is too often difficult to prove by direct and convincing evidence. In many cases it must be inferred from a series of seemingly isolated acts and instances which have been rather aptly designated as badges of fraud. When these are sufficiently numerous they may in their totality properly justify an inference of a fraudulent intent; and this is true even though each act or instance, standing by itself, may seem rather unimportant. Analogies are always dangerous but sometimes rather helpful. So the old analogy of the rope seems in order: any single strand may easily be pulled apart, but many weak strands combined into a single rope may have such tensile strength as to resist the efforts even of a giant to tear it asunder. On this principle then, we believe that the judgment below should be affirmed. So we proceed to consider seriatim these badges of fraud in the case before us.

■ The circumstances surrounding the birth of the Industrial Finance Company in October, 1936, were to say the least, quite suspicious. There was a corporation (in the incorporation of which in 1935 defendant played a part) by that name, which appears to have done a small but legitimate business. Had defendant desired (as was contended on his behalf) merely to expand this business on a larger scale, he might easily have secured an authorization to increase its capital stock. Instead, the name of the original corporation was changed to Industrial Investment Corporation, and nine days later defendant applied for a charter for a corporation to be known as Industrial Finance Company with an authorized capital of $250,000. There was evidence from which the jury might well have inferred that one of defendant's dominant ideas here was to separate his own sound but small loan business from the hazards of the new enterprise, while he used the good name of the old corporation, with which the people of Greenville were already familiar.

There was evidence to show a gross failure, in connection with securing the charter of the new corporation, to comply with the South Carolina laws as to the amount of stock already subscribed for, and the amount of subscriptions which had actually been paid in. One of defendant's first acts after the granting of the charter was to have voted to himself 25,000 shares of stock as a fee for his services in promoting the corporation; and, certainly the jury was justified in believing that such a fee was exorbitant. Possibly defendant later realized this, for he later surrendered all of these shares except 5,000 and he

deposited some of the money which he received for the subsequent sales of this stock to the account of the corporation, while some of the money he retained for himself.

The prospectus issued for the purpose of securing subscribers to the stock of the new corporation is also instructive. Caution and conservatism are not usually characteristics of the corporate prospectus. But defendant here went even beyond what has now come to be known as high-pressure. For many of the statements so glowingly set forth, defendant, in the light of his knowledge about the real situation, knew there was little or no foundation in fact. The same observation is equally true as to the letters written by the defendant to those who had subscribed for stock in the corporation.

If we may believe some of the evidence, few, if any, regular meetings of the stockholders or directors were ever held; but minutes of such alleged meetings were usually prepared by the defendant and signed by the directors wherever the defendant could find them in town. There was further evidence that the corporate records purported to show in many instances compliance with the corporation laws of South Carolina, when there was in fact no such actual compliance. Evidence showed, also, that dividends were paid only to a selected group of stockholders as men of influence who would aid in further sales of the corporate stock, when these dividends had never been earned, and when the corporation was being operated at a loss. In the letter accompanying these dividend checks to the favored individuals, defendant wrote that the dividend was being paid to all stockholders of record. There appears to be no evidence that the directors were consulted as to these dividends, though the corporate by-laws provided for the declaration of dividends by the directors. There was testimony, too, that the money paid by several subscribers to stock in the corporation was deposited to the credit of another corporation, and thus never reached the treasury of the particular corporation in which these subscribers had certificates of stock. Also there was some evidence that persons who thought they were subscribing to stock in the old corporation received stock in the new corporation.

Counsel for the United States admit that some legitimate business was done by the corporation, but the evidence is not clear as to the amount of this. The corporation's check-book, however, does seem to indicate that this business was not extensive. Of the entire number of checks issued by the corporation, 351, 70 were issued to salesmen for commissions on the sale of stock, 78 were issued in payment of dividends, and 90 for office expenses; so that only 113 checks could possibly have been issued in the course of the corporation's legitimate loan business. Some of these loans were made to the stock salesmen, others to relatives of the defendant.

The episode of the fictitious Williams note is thus set out in appellant's brief: "The facts are that the defendant, upon discovering that a holder of stock in the company was about to advertise it for sale at a small price, decided it was in the interest of the company to have the company purchase this stock and hold it as treasury stock until it could be sold. Following this conviction, he bought the stock and paid for it with money belonging to the company. Instead of cancelling the stock on the books and depreciating the assets of the company by the amount paid for the stock, he attached the stock as collateral to a note to Seven Hundred Twenty Dollars ($720.00) and signed the note with the name of E. E. Williams." Appellant's counsel admit that this was a "foolish" thing for defendant to do, but they insist that the corporation lost nothing, and the defendant gained nothing, by this transaction. A fair inference seems to be that it was done in order to deceive stockholders, examiners or others who might naturally think that the note was real, not fictitious, and constituted an asset of the corporation. This is at least a straw indicating the direction of the wind.

Defense counsel introduced no witnesses to contradict or explain the evidence of the United States but was content to offer four witnesses who testified to the defendant's reputation for good character and veracity. Appellant's counsel, however, have contended strongly that if the scheme of defendant had been really fraudulent, he would have so arranged matters as to glean for himself a far handsomer financial harvest. Also they have urged that a designer of a fraudulent scheme would never have been so gauche, so inept and so careless. We are not impressed by these contentions. The federal criminal statutes were drawn to catch both the "big shot" and the "piker".

In the light of what has been set out above, we believe that the evidence adduced by the United States was sufficient to justify the trial judge in submitting the question of whether or not the scheme here devised was, under the Mail Fraud Statute, a fraudulent scheme. That inquiry was by the jury resolved against the defendant. We see no reason for disturbing that verdict.

The judgment of the lower court, for the reasons indicated, should be, and is affirmed.

Affirmed.