Jerome D. **LINDEN**, Robert R. **Baylis**, **Classified Business Directory, Inc.**, and **Directory Listings, Inc.**, Appellants,

v.

**UNITED STATES** of America, Appellee.

No. 7566.

United States Court of Appeals Fourth Circuit.

Argued March 3, 1958.

Decided April 9, 1958.

James S. Morrow, Jr., Baltimore, Md. (Samuel Panzer, Brooklyn, N. Y., on the brief) for appellants.

Martin A. Ferris, Asst. U. S. Atty., and Leon H. A. Pierson, U. S. Atty., Baltimore, Md., for appellee.

Before PARKER, Chief Judge, SOBELOFF, Circuit Judge, and WILLIAMS, District Judge.

SOBELOFF, Circuit Judge.

The two individuals and two corporations who prosecute this appeal from the United States District Court for the District of Maryland were convicted of violating the Mail Fraud statute [1] and the Aiding and Abetting statute.[2] The appellants challenge the sufficiency of the evidence to sustain their conviction, and also allege error in the admission of certain testimony.

The indictment charges that the defendants "devised and intended to devise a fraudulent scheme and artifice * * * to induce those intended to be defrauded to purchase listings or advertisements in a book published by the defendants known as Maryland Classified Business Directory by means of captious, deceptive and misleading solicitations designed by the defendants to be misinterpreted by the recipients thereof as bills or statements of accounts due for listings or advertisements previously contracted for and maintained by those intended to be defrauded in the classified section of their local telephone directory." It is also alleged that in furtherance of the scheme the defendants caused checks to be mailed to them by their victims.

Having decided to go into the business of publishing an annual business directory for Maryland, the District of Colum-

---

1. 18 U.S.C.A. § 1341. Frauds and swindles.

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

2. 18 U.S.C.A. § 2. Principals.

"(a) Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces, or procures its commission, is a principal."

bia, and parts of Virginia and West Virginia, the individual defendants, Jerome D. Linden and Robert R. Baylis,[3] in July of 1955, rented an office in the Court Square Building in Baltimore. Three months later they formed the two corporate defendants, Classified Business Directory of Maryland, Inc., and Directory Listings, Inc.

No complaint is made that the defendants failed to publish their business directory, for they did publish it; the essence of the charge is the deceptive manner in which subscriptions for listings were procured.

Directory Listings, Inc. obtained copies of the classified telephone directories for Maryland, metropolitan Washington, D. C., and Richmond, Virginia. In New York, the home of Linden and Baylis, this company employed typists to fill out certain forms and to address envelopes.

Two basic forms were used and are here reproduced:

3. A third defendant, David Bach, was put on probation and does not press this appeal.

It is the Government's contention that the forms appear to be invoices, rather than solicitations,[4] and that the illusion was furthered by the manner in which the typists, under instructions from the defendants, filled in the forms before they were mailed to the intended victims.

The defendants' forms were sent only to advertisers in the telephone company's classified telephone directory. Under the heading of "classification," the precise classifications and sub-classifications of business enterprises which appeared in the telephone directory were typed on the forms. Moreover, the recipients' names, addresses, and telephone numbers were typed on the forms as they appeared in the telephone directory, copied even as to the abbreviations employed by the telephone company.

While, on their faces, the blank forms give a choice as to kinds of listings, the typists were directed to fill in in advance the description of the proposed listing to correspond precisely with that which the recipient had ordered in his telephone advertising. Thus, if a bold type listing appeared in the telephone book, the defendants' typists were directed to indicate the same listing on the forms they were preparing for mailing.

The second of the forms employed by the defendants had a small space designated as "Display Ad," and although the typists were furnished with lists containing different rates according to the size of the recipient's advertisement in the telephone directory, the space was filled in before mailing. The prospective advertiser was not quoted prices for other sizes, and he was not asked to make a choice between alternatives.

In the very first form sent the prospective customer a sense of urgency, further suggesting to the recipient that there was a pre-existing relationship between him and the sender, was added by printing in red ink across the face of the paper in letters much larger than any others on it, the words, "Final Notice." While, after a time the defendants abandoned the use of this phrase, there appeared in its stead the boldly printed statement, "Listing Will Not Appear Unless Payment Is Made Now," or "Listing Will Not Be Published Unless Payment Is Made."

Stamped in red across the face of many of the forms mailed was the title of the telephone directory from which the recipient's name had been taken. For example, forms sent to people listed in the Richmond telephone directory had the word "Richmond" stamped on them, and forms sent to those listed in the telephone company's "Catonsville Arbutus Elkridge and Vicinity" directory had that group title stamped on them. The geographical grouping made by the telephone company was adopted without deviation by the defendants.

On the reverse side of the forms, printed in grey ink, was information which, if carefully read, would have enabled the recipient to discover that he was being solicited for an advertisement in a new business directory. Also enclosed in the envelope was a leaflet, called in the testimony a brochure, much smaller than the form, which, if carefully read, would also have revealed that the defendants' enterprise was not identified with the telephone company's classified directory.

Each addressee received, in addition to the material already mentioned, a return envelope addressed to "Classified Business Directory of Maryland, Court Square Building, Baltimore 2, Maryland," the second of the corporate appellants.

The prosecution argues that the defendants went to considerable pains to avoid alerting the recipients of the forms to the true identity of the senders. It is

4. Whether the forms were in reality solicitations, as the defendants claim, or invoices, as the Government insists, is in dispute, although the defendant Linden himself referred to them as invoices when testifying before the Grand Jury. It must, however, be realized that the name, and even the literal meaning, of a document may be less significant than its appearance and manner of use.

pointed out that although the forms and envelopes were typed in New York, and there stamped with a postage meter obtained from the Baltimore Post Office, they were shipped from New York to Baltimore by railway express or parcel post, and then placed in the mail in Baltimore so that they would carry the postmark of that city.

Approximately 104,000 of the above-described forms were deposited in the mails in Baltimore on October 14, 1955 to persons with whom the defendants had no previous contact.

As supporting proof of the defendants' fraudulent intent, the Government introduced the testimony of Post Office Inspector Mitchell Glassman, who told of the defendant Linden's having conducted a similar operation in Cleveland, Ohio, a few months before the Baltimore venture was entered into. After the "advertising literature" used in Cleveland was disapproved by him, Glassman testified, Linden submitted a voluntary affidavit of discontinuance and left the city. Baylis, who had been Linden's accountant in Cleveland, there is reason to believe, knew of the difficulties which led to the cessation of the latter's activities in that city.

A sample of the form used by Linden in Cleveland was offered at the trial. It contains a specific warning that the directory is "Not a Telephone Company Publication." The postal inspector in Cleveland had admonished Linden that even this caution would not save the scheme from illegality. The prosecution attaches significance to the fact that in Baltimore even this much candor was abandoned.

Over the defendants' objections, approximately a dozen recipients of the forms testified that they remitted checks to the defendants in the belief that the papers they had received were invoices for their previously ordered advertising in the telephone company's classified directory. Moreover, Post Office Inspector A. J. Murray related that several times he visited the defendants' offices in the Court Square Building and warned them that many people had been confused into thinking that they were being billed for telephone company advertising, and Linden replied that he "couldn't control the thinking of people," that while he regretted it "if they believed this was a statement of charges for the yellow pages of the telephone listing," he was "not responsible for any conclusion they might infer."

The general manager of the Better Business Bureau of Baltimore told of having informed Linden that the Bureau had received numerous protests "concerning the invoices."

Although Linden and Baylis did not testify at the trial, they had earlier testified before the Grand Jury and admitted receiving "complaints" that persons were being misled. The latter freely admitted that in addition to the complaints, they had even received, from time to time, checks made out to the Chesapeake and Potomac Telephone Company. They also received letters from lawyers demanding refunds to clients who claimed that they had sent checks to the defendants in the belief that they were paying for advertisements in the telephone company's classified directory.

Despite the storm of protests, the defendants persisted in mailing their forms until the indictment was returned on June 25, 1957.

To negative criminal intent the defendants called to the witness stand the Washington attorney who had represented them in their business dealings. He testified that he had been engaged in March of 1955 by Linden to speak to Post Office Solicitor Manherz about Linden's troubles in Cleveland. He related that Manherz voiced objection to the use of the words "Classified Directory," and also objected that in his experience certain people engaged in that type of business had published no directory at all, or, at most made only a "cheap," token effort at publication. The attorney testified that he had advised the defendants that, in his opinion, "as long as you intended

to publish the book," their activities would not violate the law. The defendants told their attorney of receiving complaints that some of the recipients had confused the defendants' publication with the phone directory. He advised them to refund the money to those who complained, but did not advise any revision in their methods. The record shows instances of refunds delayed long after the complaints.

The District Judge, sitting without a jury, overruled defendants' motion for a judgment of acquittal and found the defendants guilty. He declared that the form used by the defendants was as alleged, "captious, misleading and deceptive,"; that it was "designed * * * and intended * * * to be misinterpreted"; that it was "designed so that people would not read it at all, so that people would not read it closely"; that the Government was not required to prove that the form if closely read would still confuse people; and that the defendants had engaged in "a scheme reasonably calculated to deceive persons of ordinary prudence and comprehension."

### Admissibility of Evidence.

██ We turn first to the defendants' complaint that the Court erred in admitting certain testimony of persons who claimed to have been deceived. Typical of the questions to which the objection was raised are these: "Why did you make the payment?" or, in the case of a corporate officer, "Why did you approve the payment?"

It is contended that such interrogatories called for opinions and conclusions as to the principal issue in the case, and that the province of the fact finder was thus invaded. A similar argument we recently rejected in Meredith v. United States, 4 Cir., 1956, 238 F.2d 535, 543, because "the modern tendency in the law of evidence is to give the triers of the facts all the light they can have." See, Frankfeld v. United States, 4 Cir., 1952, 198 F.2d 679; 7 Wigmore, Evidence (1940), Sec. 1920, p. 17 et seq.

██ Proof that the scheme was effective should not be excluded as irrelevant. While it is true that the success of a scheme is not a necessary element of the crime defined in the Mail Fraud statute, nevertheless where, as here, the indictment charges the defendant with making captious, deceptive, and misleading solicitations, the effect of the solicitations upon the recipients is a highly pertinent fact in determining whether the solicitations are of the nature charged. Cf. Silverman v. United States, 5 Cir., 1954, 213 F.2d 405, 407; Haid v. United States, 9 Cir., 1946, 157 F.2d 630, 632. The tendency of the form to mislead is shown by testimony that it did mislead.

 Moreover, to sustain a conviction, the intent of the defendants in devising the scheme must be to deceive and defraud, and the evidence was relevant to establish this intent. Cf. Aiken v. United States, 4 Cir., 1939, 108 F.2d 182, 183; Rice v. United States, 10 Cir., 1945, 149 F.2d 601, 603. Proof that people actually were misled by the solicitations bears directly on the testimony of Post Office Inspector Murray that on several occasions he had told Linden of the deceptive effect of his operations and that Linden replied that "he couldn't control the thinking of people." The known misleading tendency of a scheme is indicative of the defendants' criminal intent, and the trier of the facts may reasonably in such circumstances apply the presumption, founded upon common experience and recognized in law, that a person intends the consequences of his acts. See: Stearn v. United States, 4 Cir., 1927, 18 F.2d 465, 467; Agnew v. United States, 1897, 165 U.S. 36, 17 S.Ct. 235, 41 L.Ed. 624; 20 Am.Jur., "Evidence," Sec. 233, p. 228.

██ The reason that moved the victims to send checks to the defendants is material to still another element of the crime. It establishes that remittances made by the witnesses (the mailings charged in the indictment), as a result of the defendants' inducement, were in furtherance of the fraud. The law requires

that the use of the mails by the defendants, or by others induced by them, shall be in furtherance of the fraudulent scheme. 18 U.S.C.A. § 1341. See: United States v. Guest, 2 Cir., 1935, 74 F.2d 730, certiorari denied 295 U.S. 742, 55 S.Ct. 654, 79 L.Ed. 1688; United States v. Reese, D.C.E.D.Pa.1951, 96 F.Supp. 913, 916.

■ There is no substance in the further objection of the defendants that the questions in effect asked the witnesses to construe a written instrument. They were merely asked to describe the effect upon them of the forms employed.

It is urged that the District Judge committed error in receiving the answers in the particular language used by the witnesses. In one instance a witness was permitted to state, "I did so under the *assumption* that they were for the classified telephone directory, the yellow pages." In another instance, the answer was, "It was an invoice for payment which I *thought* to be of the telephone company." We think the answers in substance merely indicated in customary speech the state of mind induced by the form used by the defendants in the manner testified to.

■ Finally, it is said that the Government failed to show that these witnesses had read the solicitations fully and that this was a necessary foundation for any testimony as to what moved them to mail remittances to the defendants. But this ignores the essence of the charge of the indictment, which is that deceptiveness lies in the fact that the forms were designed not to be read carefully. The defendants cannot complain that in this factual context witnesses were permitted to testify concerning impressions gained without reading the paper through. Silverman v. United States, 5 Cir., 1954, 213 F.2d 405, 407.

### Appellants' Motion for Acquittal.

■ The law is well settled that, "when a motion for a directed verdict of acquittal is made in a criminal case, the sole duty of the trial judge is to determine whether there is substantial evidence which, taken in the light most favorable to the United States, tends to show that the defendant is guilty beyond a reasonable doubt." Bell v. United States, 4 Cir., 1950, 185 F.2d 302, 310; Glasser v. United States, 1941, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680. Recognizing their burden, the defendants nevertheless urge that, even in this light, there was insufficient evidence to sustain their conviction.

■ The scope of the crime of mail fraud is a broad one, and the Government ordinarily need prove only (1) the intentional devising of a scheme to defraud, and (2) a use of the mails in its furtherance. See, e. g., Kann v. United States, 1944, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88; Pereira v. United States, 1953, 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435; Edwards v. United States, 6 Cir., 1918, 249 F. 686.

The defendants, however, place heavy reliance upon the Third Circuit case of United States v. Kram, 1957, 247 F.2d 830, which held that although a mail fraud indictment need not allege that a solicitation was drawn so as to be intentionally misleading, if such an allegation is set up as the substance of the offense, due process of law requires that the defendant be tried only on that theory. The Kram case, say the defendants, also stands for the proposition that the court may examine only the *wording* of the forms, and since, if read carefully, their true nature would be discovered, the statute has not been violated.

Since the Judge has found as a fact that the forms in this case were "captious, misleading, and deceptive," and since we perceive no error in this finding, we do not reach the constitutional question.

We think, however, that the defendants misconceive the Kram decision, for there is nothing in it that limits the court or jury to an examination of the language of a paper in determining whether it is deceptive. In that case, the Court merely held that the language employed was

clearly a solicitation containing nothing that was "really misleading." It does not follow that in our fact situation the defendants are also entitled to such a holding and to an acquittal.

■ The theory of the present prosecution is that the forms were designed and used in such manner that they would not be read closely and would thus ensnare and deceive. The charge is not that, if the words are parsed and the sentences grammatically analyzed, they are false. Deception is not necessarily confined to a direct statement of fact. Not words alone, but their arrangement, the manner of their display, and the circumstances in which they are used, may create an appearance which is false and deceptive, even though the words themselves fall short of this. Sometimes circumstances are more eloquent than words, and they impart their meaning to the words used. 7 Wigmore, Evidence (1940), Sec. 1969, p. 109; Silverman v. United States, 5 Cir., 1954, 213 F.2d 405, 407.

■ The District Judge did not exceed the proper bounds in concluding that the defendants distributed the criticized forms among the intended victims, relying on the habit of many to bestow no more than a quick, careless glance at a familiar looking paper and to assume that its substance is that which its superficial appearance suggests. The testimony was fairly susceptible to the interpretation put upon it by the District Judge, that the over-all make-up and use of the form was tantamount to a representation that its senders had had business relations with the recipient and that the sum indicated thereon was due them by him. Ordinarily one soliciting business does not adopt the tone of a delayed creditor.

There was a reasonable basis in the evidence from which the Judge could find, as he did, that the creditor with whom the defendants intended that they should be confused was the telephone company.

■ That the defendants proceeded under advice of a lawyer is a fact to be considered together with other facts in determining the question of the defendants' good faith, but legal advice does not under all circumstances constitute an impregnable wall of defense. Miller v. United States, 4 Cir., 1921, 277 F. 721, 726. To hold otherwise would be to say that no matter how violative of law a defendant's conduct may be, and regardless of consciousness of wrongdoing on his part and his adviser's, the advice confers immunity. No such doctrine has been given legal sanction. See: United States v. McMillan, D.C.1953, 114 F. Supp. 638, 642; 15 Am.Jur., "Criminal Law," Sec. 309, p. 12. Cf. Yarborough v. United States, 4 Cir., 1956, 230 F.2d 56, certiorari denied 351 U.S. 969, 76 S.Ct. 1034, 100 L.Ed. 1487.

■ The defendants undertake to distinguish the Silverman case, relied on by the Government, on the ground that there the defendant published no directory at all, while here, out of collections amounting to $87,000 to the date of the indictment, $40,000 was spent by the defendants to issue their publication. While this illustrates that the Silverman fraud was more brazen than that laid to the defendants, both are violations of the statute. In each the scheme was to shear the victims by luring them into paying for advertising through a calculated deception. It is sufficient to sustain the conviction here if unwanted items of merchandise or services were intentionally "palmed off" as those which the customers desired and thought they were paying for. Cf. Rude v. United States, 10 Cir., 1935, 74 F.2d 673.

The evidence suggests the possibility that the defendants may have had a double motive. Some would read carefully and appreciate that the defendants were not a concern with whom they had done business in the past, and from some of these the defendants may have hoped that new business might legitimately result. But the presence of this unobjectionable intent, which is incidental, would not excuse or justify the dominant motive, if such were the finding, of deceiving the unwary. This, in short, is

what the Court found, and the finding is sufficiently supported in the record.

The conviction is therefore,

Affirmed.

The late Chief Judge JOHN J. PARKER expressed his approval of the result in the foregoing case, but died on March 17, 1958, without having had an opportunity to consider the opinion.