**UNITED STATES of America**

v.

**Robert K. BERTIN, Joseph Krevolin, Willard Talesman and Irving Pitchnick.**

**Crim. No. 27000.**

United States District Court
D. Maryland.

Feb. 23, 1966.

Thomas J. Kenney, U. S. Atty., and Thomas P. Curran, Asst. U. S. Atty., Baltimore, Md., for plaintiff.

Stephen H. Sachs, Baltimore, Md., for defendant, Bertin.

Leon H. A. Pierson and H. Russell Smouse, Baltimore, Md., for defendant, Krevolin.

Jacob Y. Miliman, Baltimore, Md., for defendant, Talesman.

THOMSEN, Chief Judge.[*]

### The Indictment

This fifteen-count indictment for mail fraud, 18 U.S. Code, Section 1341, with a reference in each count to 18 U.S. Code, Section 2, is based upon an alleged scheme to defraud and to obtain money by means of false and fraudulent pretenses, representations, and promises from a class of persons who are interested in reducing their monthly payments on existing debts by obtaining debt consolidation loans. It charges four defendants, Bertin, Krevolin, Pitchnick, and Talesman, with having devised the scheme and having done or caused to be done various things in furtherance thereof in Maryland and elsewhere.

The first count charges in substance:

1. From on or about June 17, 1964, and continuing to on or about April 29, 1965, within the District of Maryland and elsewhere, the defendants Robert K. Bertin, Joseph Krevolin, Irving Pitchnick and Willard Talesman devised a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises from a class of persons who were interested in reducing their monthly payments on existing debts by obtaining debt consolidation loans, referred to as "homeowners."

2. For the purpose of promoting, conducting, and carrying on the scheme, the defendants would and did operate through Prime Lenders, Inc., incorporated in Pennsylvania in August 1964, and authorized to do business in Maryland in September 1964, and other specified corporations.

3, 4, 5. The defendants would and did cause Prime Lenders, Inc., to operate out of the Baltimore offices of United Insurance Company of America (United), pursuant to an agreement reached between the defendants and the home office of United; defendants would and did cause to be employed by Prime Lend-

[*] Orally, after trial before the Court without a jury. The opinion has been edited and abbreviated.

ers, Inc., insurance agents, licensed by the State of Maryland, to sell policies of life insurance of United; and defendants would and did mail and cause to be mailed to homeowners, letters on the stationery of Prime Lenders, Inc., which, among other things: (a) advised "that there are liens outstanding recorded against your property"; (b) stated that Prime Lenders, Inc. was "in the position to consolidate all your debts without the use of a lien against your property"; (c) suggested that "hardships" and "embarrassment" could be avoided in view of the "financial assistance" which Prime Lenders, Inc. could render; and (d) bore the name "B. Williams" in typewritten and signature form, which name was false and fictitious, as the defendants well knew.

6. It was a part of the scheme that homeowners responding to the letters would be induced by defendants to apply for a debt consolidation loan and to pay a $20.00 fee as part of the cost to Prime Lenders, Inc. of securing credit and property reports.

7. Homeowners applying for debt consolidation loans would be induced by defendants to apply also for a policy of life insurance of United, and to submit therewith an undated and otherwise blank promissory note, on the representation of defendants that the purchase of such policies would strengthen the homeowners' prospects of obtaining loans through those sources of funds available to Prime Lenders, Inc.

8. Once having induced the homeowners to apply for life insurance, the defendants would and did the following in order to induce the homeowners to pay to and for the benefit of the defendants monthly payments of an amount equal to the monthly premiums on the insurance policies, that is, $20.00 per month:

(a) Complete the blank note by making it payable in the amount of $240.00 to the order of First National Investment Plan, Inc., the entire sum due and payable one day after current date, endorsed "without recourse" to third party corporations for collection;

(b) Represent and cause to be represented that the life insurance policies of United were non-cancellable until the termination of one year from date of issue and until payment by each homeowner of $240.00 in premiums;

(c) Represent to inquiring homeowners that their loan applications were being processed, the defendants well knowing that, in most instances, loans would not be made.

9. In order to induce the homeowners to visit the Baltimore office of Prime Lenders, Inc., to apply for debt consolidation loans, to apply for and purchase policies of life insurance, and to persuade the homeowners to pay and to continue to pay monies to defendants and for their benefit, that defendants made and caused to be made the following false and fraudulent pretenses, representations and promises, well knowing the same to be false and fraudulent when made:

(a) That Prime Lenders, Inc. was a large corporation with offices in all principal cities, which had the facilities to render, and which would render to homeowners, financial assistance easily and quickly in the form of debt consolidation loans, to be paid back with low monthly payments.

(b) That such debt consolidation loans could be obtained through Prime Lenders, Inc. without the use of liens against the homeowners' properties.

(c) That the cost to Prime Lenders, Inc. of securing credit and property reports, in conjunction with loan applications, was $40.00 to $50.00 per homeowner.

(d) That funds paid by homeowners for credit and property reports would be used by Prime Lenders, Inc. to secure such reports.

(e) That the purchase of life insurance policies of United would strengthen the homeowners' prospects of obtaining loans through those

sources of funds available to Prime Lenders, Inc.

(f) That the insurance policies of United were non-cancellable until the termination of one year from date of issue and until payment by each homeowner of $240.00 in premiums.

10. In making the said false and fraudulent pretenses, representations and promises, defendants knew that in most instances debt consolidation loans would not be made to the homeowners, and in those instances in which such loans were made, defendants would and did:

(a) Increase substantially the face amount of the loan requested by each such homeowner;

(b) Disburse to and for the benefit of each such homeowner total funds substantially less than the face amount of the loan, secured by a note and second mortgage on such homeowner's property; and

(c) Retain for their own personal use and benefit the difference between the face amount and the disbursing amount of each such loan, so as to enable defendants to assign the said notes and mortgages at attractive discount rates to third party corporations and at hidden profits to defendants.

all without the knowledge and consent of the homeowners.

11. On or about July 31, 1964, defendants placed and caused to be placed in an authorized depository for mail matter in the State and District of Maryland, a letter addressed to Mr. and Mrs. E. Cannon, 3517 Fairview Avenue, Baltimore, Maryland, to be sent and delivered by the Post Office Department of the United States.

The other fourteen counts reallege the first ten paragraphs of Count 1 and charge various mailings in Maryland or the causing to be delivered by mail in Maryland of letters and other material on specified dates between August 1964 and April 1965.

Pitchnick pleaded nolo contendere and testified for the Government. The other three defendants have been tried by the Court without a jury. Bertin and Krevolin took the stand admitted most of the historical facts set out in the indictment and testified to by the Government witnesses, but disputed the falsity of some of the representations, denied knowledge of the falsity of some, and denied any intention to deceive or defraud the homeowners or anyone else.

Talesman did not take the stand, and offered no evidence, except such as was brought out on cross-examination of the other defendants by his counsel. All three defendants on trial have been ably represented.

*The Law*

"The scope of the crime of mail fraud is a broad one, and the Government ordinarily need prove only (1) the intentional devising of a scheme to defraud, and (2) a use of the mails in its furtherance." Linden v. United States, 4 Cir., 254 F.2d 560, 567 (1958), citing Kann v. United States, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944); Pereira v. United States, 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435 (1953); Edwards v. United States, 6 Cir., 249 Fed. 686 (1918).

That statement from *Linden* was paraphrased in a recent opinion by Judge Pickett, in Gusow v. United States, 10 Cir., 347 F.2d 755, 756 (1965). Judge Pickett continued:

"The scheme is one to defraud if it is reasonably calculated to deceive persons of ordinary prudence and comprehension. Silverman v. United States, 5 Cir., 213 F.2d 405, cert. denied 348 U.S. 828, 75 S.Ct. 46, 99 L.Ed. 653; United States v. Baren, supra [2 Cir., 305 F.2d 527]. Direct proof of willful intent is not necessary. It may be inferred from the activities of the parties involved. Henderson v. United States, 6 Cir., 202 F.2d 400. Not only are the patently false statements prohibited, but also those made with a reckless indifference as to whether they are true or false. Babson v. Uni-

ted States, 9 Cir., 330 F.2d 662, cert. denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed. 1045; West v. United States, 10 Cir., 68 F.2d 96. Similarly, the deceitful concealment of material facts may also constitute actual fraud. Cacy v. United States, 9 Cir., 298 F.2d 227. Moreover, the deception need not be premised upon the verbalized words alone. The arrangement of the words, or the circumstances in which they are used may convey the false and deceptive appearance. Linden v. United States, supra." 347 F.2d at 756.

■ The proposition that the intention of the defendants may be inferred from their conduct during the continuance of the scheme is supported by Aiken v. United States, 4 Cir., 108 F.2d 182, 183; United States v. Hopps, 4 Cir., 331 F.2d 332, 337 (1964); and United States v. Dillinger, 4 Cir., 341 F.2d 696, 698 (1965).

Relying on *Hopps,* United States v. Kram, 3 Cir., 247 F.2d 830 (1957), and United States v. Culver, D.Md., 224 F. Supp. 419, 424 (1963), each of the defendants argues that since the Government elected to include in the indictment the allegedly false and fraudulent pretenses, representations, and promises set out in subparagraphs (a), (b), (c), (d), (e) and (f) of Paragraph 9 of the indictment, the Government must prove beyond a reasonable doubt that one or more of those specific representations was made, that it was a material part of the scheme, that the defendant in question knew or intended that it would be made, that it was false, and that the defendant knew it was false when it was made. Although there may be some doubt as to whether the requirement goes so far as defendants contend, see discussion of *Kram* in *Linden,* 254 F.2d at 567, and the context in which the requirement was made in *Hopps* and *Culver,* this Court will assume that the Government carries that burden in this case. Defendants concede that it is not necessary that the Government prove that all of the alleged representations were false and fraudulent.

*Facts*

■ Krevolin had been engaged for some years in the home remodeling (home improvement) business in Philadelphia and for a while in Baltimore, when, about 1962, he joined forces with Bertin in the loan and mortgage brokerage business, specializing in debt consolidation by means of second mortgages in Philadelphia and elsewhere in Pennsylvania and New Jersey.

Debt consolidation, as practiced by defendants before and during the time of the venture referred to in the indictment, involves finding people who own real estate and owe debts requiring large monthly payments, which in Philadelphia are usually secured by judgment notes and in Baltimore by various types of liens. Bertin and Krevolin usually discovered these prospects by newspaper or radio advertising. Others used direct mail. Any type of advertising usually indicates that a reduction in monthly payments and the elimination of existing judgment notes and other existing liens may be achieved. Salesmen then interview the prospects who reply, learn how much money the prospect needs, obtain the necessary credit information, and obtain an application for a loan. The amount of the second mortgage is usually about seventy per cent larger than the amount advanced and is customarily payable in sixty equal monthly payments. For example, if a loan of $2,000 is made, the mortgage would ordinarily be for $3,400, payable in sixty monthly payments of $65.74 each.

A rate chart showing the monthly payments was used. Slight changes were made in these charts from time to time, and one of the charts used by one of Bertin and Krevolin's sub-brokers in Baltimore and used by the salesmen in the venture referred to in the indictment was offered in evidence, and it was agreed that these figures did not change very much one way or the other over the years.

Most applicants are so interested in reducing the monthly payment that little

attention would be given to the increase in the principal amount and length of the payment period.

Such a second mortgage is then peddled to various large lenders, such as Atlas Mortgage Company, of which there were four or five in Philadelphia. They usually pay the broker as his commission twenty-five per cent of the amount advanced. Sometimes the commission is only fifteen or twenty per cent. On a loan of $2,000 with a mortgage of $3,400, the broker would therefore get $500 out of the $1,700 load. The salesman, if working on a commission basis, is ordinarily paid all but five per cent out of the broker's commission.

Bertin and Krevolin were forced to give up this business in Pennsylvania by an amendment to the Pennsylvania law as a result of the Act of July 30, 1963, P.L. 335, Purdon's Statutes Annotated, Title 7 (Banks and Banking) Chapter 27 (Loan Brokers), Sections 761–3, 761–5, 761–6, 761–13, 761–14, and 761–18. They opened offices in some southern cities and established connections with sub-brokers in Baltimore and elsewhere. They operated from their Philadelphia office as master brokers.

Pitchnick had worked for Bertin and Krevolin as a salesman for a few days but had not produced any applications, and left for greener pastures.

In early 1964 Pitchnick and Talesman had been associated in the insurance business for a while, and Pitchnick had conceived the idea of selling life insurance to a "captive audience" of persons (usually a husband and wife) brought into the office by the use of a letter similar to that used in the debt consolidation business. They had established contact with an insurance company which paid them a commission of eighty-five per cent on the first year's premiums. They sold everyone a twenty-payment life policy (i. e., twenty annual premiums, 240 monthly premiums) in whatever face amount monthly premiums of $20 each would purchase. They took judgment notes, which they filled out for $240, rep-

resenting twelve monthly payments of $20 each, sold the notes to a finance company or other financial institution for about $120, "annualized" the first year's premiums by paying fifteen per cent of $240, less a small discount for prepayment and kept the balance.

About the first of June 1964 they approached Bertin and offered to sell to Krevolin and Bertin a "franchise" for $25,000 on the representation that they had a valuable secret business formula out of which Pitchnick and Talesman were making large sums of money, having twice taken out profits of $50,-000, which did not take into account their large weekly drawings. Krevolin was not willing to buy a pig in a poke, but Bertin and Krevolin were sufficiently impressed that they agreed to enter into what was essentially a partnership agreement between Pitchnick and Talesman on the one hand and Krevolin and Bertin on the other.

The agreement recited that "Talesman and Pitchnick possess unique and special knowledge of the field of insurance which they desire to impart to Krevolin and Bertin and that Krevolin and Bertin possess valuable and effective marketing connections throughout Pennsylvania and other states, and that the parties desire to pool their efforts to engage in the sale and financing of life, health, and accident, and other insurance."

The agreement provided in part that "Talesman and Pitchnick will instruct and train Krevolin and Bertin in the sale of life, health, and accident insurance," and that they would form a corporation to act as a finance company and split the stock equally between the two groups.

Finally, Pitchnick disclosed his idea, which was essentially the scheme set out in the indictment, to be conducted in some state without a law similar to the Pennsylvania amendment. He showed Bertin and Krevolin the letter he and Talesman had been using, which differed only in one phrase from a letter Bertin and Krevolin had used briefly.

The only difference was in the second sentence in the second paragraph where the word "judgment" was used rather than the words "liens and incumbrances."

In the next conversation Pitchnick referred to the homeowners who could be induced by means of the letter to come to the office as a "captive audience" for the sale of insurance.

Bertin and Krevolin at first felt "sold," but after assurances that a lot of money could be made by polling their skill and connections, Bertin and Krevolin checked with the insurance company which Pitchnick and Talesman had been using for about eighteen months, and were told that the lapse rate had not been very high. Bertin then sounded out his brother, a very successful agent of the United Life Insurance Company of Chicago, and found him interested and willing to take the matter up with United.

The brother arranged with United that the venture might place policies with it and use space in United's offices anywhere in the country, with certain exceptions. The policies were to clear through the brother's agency, located in Detroit, Michigan. United agreed to pay a commission of ninety per cent of the first year's premiums, so that defendants had to advance only $2 on each policy sold to carry it for a month. It does not appear from the evidence whether any commissions were allowed on any premiums collected after the first year.

Krevolin asked Pitchnick and Talesman about the legality of the scheme, and was told by them that it had been approved by Pitchnick and Talesman's lawyer, and that they had had no trouble with the postal inspectors. No doubt the plan was not illegal in any state which did not have a law similar to the Pennsylvania law and would not violate the mail fraud statutes provided, of course, that no false and fraudulent misrepresentations were made. The defendants do not contend that they are entitled to rely upon the classical defense of advice of counsel, but the Court agrees with them that the Court should consider what was said and what was not said by Pitchnick and Talesman with respect to what their lawyers had told them.

There is no evidence that any of the defendants ever took up with their lawyers the specific circumstances involved in the operation of the scheme charged in the indictment.

After an excursion to Norfolk, where Talesman demonstrated to Bertin how the plan worked, the four defendants decided to begin operations in Baltimore.

It was agreed that the letter Pitchnick and Talesman had been using in Philadelphia should be used, changing the words "judgment notes" to "liens" in both the first and second sentences because Pitchnick said that judgment notes were not generally used in Maryland.[1] This change made the second sentence of the letter clearly false, since the scheme involved the use of mortgages to secure any loans which might be made. The Court finds from the evidence that the three defendants on trial knew that mortgages were liens. This matter will be discussed further below.

In June 1964 the four defendants had organized First National Investment Plan, Inc., a Pennsylvania corporation, in which each had an equal interest, and in August 1964 they organized Prime Lenders, Inc. to carry on the business in Maryland. Each of the four, and Bertin's brother, put up $500 to finance Prime Lenders.

The operation in Maryland began in July, when Bertin and Talesman came to Baltimore, hired Norman Miller, the first salesman, and set up a small office in the suite occupied by United. Miss Anita Greif was hired as office manager. Girls were employed to obtain from the land records the names of persons who had received deeds or given mortgages during recent years. These names would be written on envelopes and on letters in the form set out in Note 1, which were mailed to the addressees. About October

1. See Appendix.

6, 1964, the second sentence of the letter was modified to read: "We are in the position to consolidate all your debts into one low monthly payment." The letters would all be signed "B. Williams," a fictitious name. When a recipient of a letter telephoned, Miss Greif would try to make an arrangement for him or her to come to the office to meet the salesman, bringing his or her spouse and all records of the loans they wished to consolidate.

When they came to the office the salesmen were instructed to and did (1) obtain a loan application showing details of all existing obligations and the amount needed to pay them off, and later after a discussion about insurance a consent to the obtaining of credit information and a $20 application too whenever possible. The salesmen were also instructed to try to persuade the applicant to purchase life insurance, representing to him that it would strengthen his prospects of obtaining a loan. The falsity of this representation will be discussed later. The premiums were always $20 a month, and the amount of insurance was always to be what those premiums would purchase, as in Pitchnick and Talesman's Philadelphia operation.

Neither the applicant nor the salesman would ordinarily know how much insurance would actually be bought. If the prospect agreed to take the insurance, the salesman would have the applicant sign (1) two insurance applications, one to be used in case the insurance could be obtained without a physical examination and one if it could not, and (2) a blank note, telling the applicant that the note would be filled out for $240, representing the twelve monthly premiums of the first year. With some variations, discussed below, the applicants were told that the insurance was non-cancellable for one year, or would have to be carried until the twelve monthly premiums covered by the note were paid, and that after the first year it was optional.

Despite the representations that the insurance would strengthen the loan application, the salesman was instructed to and did have the applicant sign an affidavit as follows:

"I/We, the undersigned do hereby aver and swear that we are fully aware we are buying insurance for the protection of our home and family

"I/We further aver and swear that the fact that we are making a mortgage loan application is in no way responsible for our buying the above insurance

"Further regardless of whether or not our mortgages loan application is approved or rejected, we are happy and satisfied that in buying mortgage protection insurance we have bought the best possible protection for our home and family."

The part the several defendants played in instructing the salesmen and in the whole operation will be discussed below.

The operation in Baltimore was conducted generally as the four defendants had agreed it should be conducted, as will be more fully developed in discussing the indictment paragraph by paragraph.

1. The evidence establishes without serious question that the four defendants devised a scheme which contemplated obtaining money by means of certain representations from a class of persons who were interested in reducing their monthly payments on existing debts by obtaining debt consolidation loans. Defendants deny that the representations were false or fraudulent and deny that the scheme was intended to defraud anyone. Whether the representations were in fact false and fraudulent will be discussed specifically and in detail, paragraph by paragraph. The conclusion whether the scheme should be considered a scheme to defraud will be drawn after a consideration of all the evidence.

2–7. So long as the term scheme is used in a neutral sense, without an innuendo of fraud, defendants do not seriously dispute that the acts set out in paragraphs 2, 3, 4, 5 and 6 of the indictment were done. The Court finds that the facts set out in those paragraphs

have been clearly proved. The evidence proves the facts set out in Paragraph 7, namely, that it was a part of the scheme that homeowners applying for debt consolidation loans would be induced by defendants to apply also for a policy of life insurance of United and to submit therewith an undated and otherwise blank promissory note, on the representation of defendants that the purchase of such policies would strengthen the homeowners' prospects of obtaining loans through those sources of funds available to Prime Lenders, Inc. The evidence further shows that the homeowners were so induced to apply for insurance and that the representation alleged was regularly made to them.

8. There is no serious dispute that the acts set forth in Paragraph 8(a) were done, that the representations set out in (b) were made to some applicants, and that the representation set out in (c) was made. If not in effect admitted, the evidence shows clearly that the defendants knew at the beginning that in many instances loans would not be made, and after a short period of operation in Baltimore knew that in most instances loans would not be made.

9. The principal contest is over the representations set out in Paragraph 9.

(a) The Court finds that the letter of Prime Lenders, Inc. was misleading, and that the defendants knew from the beginning that they could not render the services indicated in the original or the substituted letter to many of the people to whom the letters were sent. The letter was further misleading in that it referred to the monthly payments which would be payable on a 15-year loan, whereas the plan agreed upon by the defendants contemplated five-year second mortgages on which the monthly payments were about four times as large as those indicated in the letter. But the Court cannot find beyond a reasonable doubt that representation (a) was false and fraudulent by itself.

(b) On the other hand, the original letter, used until at least October 6, 1964,[2] unequivocally made representation (b). That representation was false. The three defendants on trial may not have realized the statement was literally false when they first authorized the letter, but they made it recklessly to induce people to come to the Baltimore office so that they could obtain mortgage applications and try to sell them insurance and made it without regard to whether the representation was true or false. Moreover, all three of them learned not later than the end of August after the Better Business Bureau letter of August 20, 1964, that the representation was false. Bertin asked Talesman to take care of the matter, but none of the three directed that the letter be discontinued, and it was used for more than a month thereafter.

Defendants contend that representation (b) was corrected when people telephoned or came into the office and the government therefore cannot rely on that representation to convict. The Court finds that if people asked about it, they were told there would be a mortgage, but many people did not ask, and the correction was not volunteered. The purpose of the letter was achieved when it induced the prospect to visit the office.

Defendants rely on Rude v. United States, 10 Cir., 74 F.2d 673 (1935), to support their argument that a conviction cannot be based on representation (b) in Paragraph 9 unless some other representation charged in that paragraph to have been false and fraudulent is proved beyond a reasonable doubt. The facts and the indictment in *Rude* were different from the facts and the indictment here, and although this Court doubts whether the decision in *Rude* is generally applicable or can be squared with cases in the Fourth Circuit and other circuits, including the most recent Tenth Circuit case, it is not necessary to resolve those doubts here. In this case not only did the letter succeed in

2. See Appendix.

inducing many prospects to come into the office, some of them were never told that their application if granted would result in a lien, so the misrepresentation was not corrected as to them; and, more importantly, other misrepresentations were made about the insurance after the prospects had been lured into the office. Although the *Rude* bridge may carry the defendants over representation (b), it cannot carry them safely over representation (c).

(c), (d). Representations (c) and (d) were made to some applicants, but the Court cannot find beyond a reasonable doubt that they were authorized by defendants. The cost of processing the applications was probably in excess of $20, perhaps twice that amount if all office expenses were considered. The collection and retention of the $20 fee from applicants for whom nothing could be done was unjustifiable, but is not the representation charged in (c) and (d). The application fee was usually refunded if the Better Business Bureau demanded it, not if the homeowners alone complained.

(e) All four defendants knew from the beginning that applicants would be told that the purchase of life insurance policies of the United Insurance Company of America would strengthen the homeowners' prospects of obtaining loans through those sources of funds available to Prime Lenders, Inc. This was an essential part of the plan from the very beginning. The Court finds that the representation was made to all or practically all of the applicants, even after defendants knew that the situation of some of them was so hopeless that no effort would be made to process their applications. The Court does not believe the testimony of Bertin and Krevolin that they thought the insurance might strengthen the applications.

The correspondence does not support Bertin's testimony that he suggested a package deal to United or that United was the least bit interested in any such idea. Only nine or ten applications were ever submitted to United and none was accepted. The affidavit that there was

no tie-in between the insurance and the application for a loan, which defendants caused each applicant to make, is more a badge of fraud than evidence on this point; but it is a straw. The insurance was not mortgage protection insurance, as referred to in the affidavit. Krevolin knew that many of the applications were not worth processing. He told this to the others and said they were the worst he had ever seen. Bertin told one of the salesmen, Calvin Miller, that he knew many of the applicants would not get loans but that Miller should sell them insurance anyway.

The mortgage and finance companies to whom defendants tried to sell the mortgages were not told about the insurance, which it may be noted was cancellable for nonpayment of any monthly premium.

In the case of the few mortgages which were made, the settlement attorney was not told about the insurance, and the insurance was not made payable to the mortgagee. Indeed in one or two cases there was no insurance. The insurance was far more expensive than straight life; the amount was geared to a $20-monthly premium, not to the amount of the mortgage or the needs of the applicants; and most significantly, the applicants were told that the payment of premiums after one year was optional. Defendants were interested only in the first year's premiums, out of which they received or retained as commissions ninety per cent (later ninety-five per cent) of the premiums collected. The insurance and the note were geared to the maximum commission to defendants without regard to the protection of the mortgagees.

(f) Some applicants were told that the policies were non-cancellable for a year; some were told that the $240-note would carry the policies for a year and that the note would have to be paid; and other similar representations were made. The reason for the variety of representations was that the defendants had at first hoped to "annualize" or sell the $240-notes, pay the $22 or $23-premium necessary to carry the policies for one year and to keep the balance. When this

proved to be impossible, Krevolin and Talesman arranged to have the notes collected through the collection departments of credit companies with which they did business. Krevolin managed to raise $1,-000 on some of the notes, but so little was collected that the four defendants had to take up most of the balance.

The applicants were told that they had to make the twelve payments of $20 each. If they did so, defendants were obligated to pay the premiums. But few, if any, of the applicants made all of the payments and only $1,400 of insurance premiums was ever collected by anyone on premiums or on the notes. In fact, of course, the policies could be cancelled at any time, and most of them were cancelled during the first year for non-payment of premiums. In substance, the representation was false, however it was worded. Defendants knew it was false except in so far as they had obtained judgment notes signed in blank by means of false representation (e).

In conclusion, therefore, the Court finds that the Government has proved beyond a reasonable doubt misrepresentations (b), (e), and (f) in Paragraph 9.

10. The facts alleged in Paragraph 10 of the indictment are not seriously disputed and are clearly proved.

11. The mailing referred to in Paragraph 11 was clearly proved.

So were the mailings and deliveries charged in each of Counts 2 to 15 inclusive.

This brings us to the final question: Was the scheme a scheme to defraud, known to be such by the three defendants on trial?

In addition to the evidence discussed above, the following facts tend to prove the character of the scheme and the knowledge of the several defendants.

Some five or six salesmen were employed during the five months or so that the operation was actively carried on in Baltimore. None lasted more than a month or two. The salesmen were usually trained by one Shore (a connection by marriage of Talesman), who was employed by Pitchnick and Talesman in their Philadelphia operation. Talesman came to Baltimore from time to time, once for a period of several days, to check on how the salesmen were operating. He observed their presentations from time to time and occasionally took applications himself to show them how it should be done.

Talesman instructed the salesmen always to tell the prospects that there was a good chance that they would get a loan, to insist that they keep up the $20-monthly payments on on the note for the insurance, and if they complained of the delay to say that the loan was probably coming through in a few weeks. Bertin also told at least two of the salesmen never to tell the people they had been turned down, although, as he told one salesman, he knew few of them would get loans.

Bertin made periodic visits, always accompanied by Pitchnick or Talesman, to check on the operation in Baltimore. Bertin was familiar with what was being said and done by the salesmen.

The evidence shows extreme efforts to conceal the names of the defendants as the backers of the Baltimore operation.

The checkbooks were kept by Pitchnick for a few weeks in and around August; then all the records of the Baltimore operation were sent to the office of Bertin and Krevolin in Philadelphia. Bertin processed the insurance applications. Krevolin processed such mortgage applications as were worth processing. He decided whether to have a credit search made by an outside agency, to obtain a report from such an agency, or to make a credit check by telephone through the employees of Bertin's and Krevolin's office.

The quality of the applicants and applications was far below what had been hoped for, and the salesmen were not always able to sell the insurance, to the annoyance of all of the defendants.

Defendants stopped sending out letters and closed down the Baltimore operation around the end of November or the first of December 1964, except for collecting the $20-monthly payments and processing

some of the applications. Krevolin arranged for Miss Greif to take the open files to one of his sub-brokers to see if the sub-broker could do anything with them.

Defendants Bertin and Krevolin say that they did not intend to defraud anybody. But the evidence shows that they devised a scheme to obtain money by means of false and fraudulent pretenses, representations, and promises from a class of persons who were interested in reducing their monthly payments on existing debts by obtaining debt consolidation loans. The facts show that the scheme was carried out substantially as the four defendants had agreed, with slight modifications from time to time known to all the defendants. It was a scheme to defraud, under the cases cited above, and defendants must be held to have intended to do what they planned to do and what was in fact done.

The Court has considered the testimony of Krevolin, referred to above, with respect to what Pitchnick and Talesman told him their lawyers had said and that they had not theretofore been troubled by the postal inspectors, but that testimony, considered with the other evidence, does not create a reasonable doubt in the mind of the Court as to the guilt of any of the defendants.

The Court finds that the Government has proved beyond a reasonable doubt that each of the three defendants on trial are guilty as charged on each of the fifteen counts of the indictment.

## APPENDIX

### Prime Lenders, Inc.
*Servicing 1st and 2nd Mortgages*
Offices in All Principal Cities

889–4661

2313 St. Paul St.
Baltimore, Md.

Dear Mr. & Mrs. Vidali

We have been advised by our field agent in this area, that there are liens outstanding recorded against your property.

We are in the position to consolidate all your debts into one low monthly payment without the use of a lien against your property. We will also remove all liens that now appear on the county records against your property.

There's no reason to suffer hardships or embarrassment needlessly when you can get financial assistance easily and quickly with one low monthly payment.

If you are interested, the following is our schedule of monthly payments:

| AMOUNT | | 15 YEARS |
|---|---|---|
| $ 2,000.00 | IMMEDIATE | $16.88 |
| 3,000.00 | CONFIDENTIAL | 25.32 |
| 5,000.00 | FAST RESULTS | 45.20 |
| 10,000.00 | | 84.39 |

For further information please call Mr. Williams at 889–4661 or write to Prime Lenders, Inc., 2313 St. Paul Street, Baltimore, Maryland.

Very truly yours,

*B. Williams*
B. Williams